THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* DOMINICK DE MARTINO, Appellant.

Second Department, November 19, 1937.

*Frank W. Holmes* [*Paul O'Dwyer* with him on the brief], for the appellant.

*Harry S. Sullivan, Assistant District Attorney* [*William F. X. Geoghan, District Attorney*, with him on the brief], for the respondent.

CLOSE, J. In the morning of October 13, 1936, a motion picture theatre known as the Hollywood, on New Utrecht avenue, Brooklyn, was held up by three armed men. Two porters engaged in cleaning the place were bound and gagged, and one of the criminals stood guard over them. The other two confronted the theatre manager, one Varnell, when he entered a few minutes later, and at the point of guns compelled him to open the safe, containing $355. Varnell was then bound and forced into a closet, with appropriate warnings. He ultimately succeeded in freeing himself. The safe had been rifled and the thieves were gone. He found and liberated the two porters and notified the police.

The appellant and another defendant, Palmeri, were arrested five days later and charged with the crime. They were subsequently indicted for robbery in the first degree and brought to trial in the County Court. Palmeri was acquitted by the jury. De Martino was convicted, and he takes this appeal. The main question is whether he was given a fair trial.

Of the evidence taken at the trial, it is sufficient to say that the principal issue was one of identity; that each defendant relied on an alibi; that Varnell identified Palmeri as one of the robbers, though his testimony was greatly weakened on cross-examination; and that Moultrie, one of the porters, identified both defendants, and testified with positiveness that the appellant was the bandit who had stood guard over him while the others secured the loot. Smith, the second porter, had disappeared prior to the trial, but his testimony in the Magistrate's Court was read into evidence after the laying of a foundation which made such testimony admissible under section 8 of the Code of Criminal Procedure. In that testimony Smith had positively identified De Martino. The appellant called three witnesses to testify that he was at his home on the day of the crime. He did not testify in his own behalf. Palmeri took the stand, and called another witness to testify that he had been in a barber shop in Manhattan at the time when the robbery was committed.

This evidence, standing by itself, presented questions of fact to be resolved by the jury. Without intervention by the trial judge, the evidence was ample to justify the jury in finding a verdict of guilty against the appellant, if they chose to believe the People's witnesses in preference to his own. Unfortunately, the activities of the trial judge had the effect of depriving the defendant of a fair trial, and we are accordingly compelled to reverse the judgment of conviction.

During the examination of Varnell, the first of the People's witnesses, an unusual occurrence took place under the direction of the trial judge. On cross-examination this witness expressed doubt about the accuracy of his identification of Palmeri. On redirect examination he admitted that he had spoken to a relative of one of the defendants in the courthouse corridor. Thereupon the trial judge interrupted the proceedings by inquiring of the witness whether he had spoken to certain designated spectators in the courtroom. Varnell was finally ordered to pass down among the spectators and indicate the men he had talked to, with a pointed warning to " be sure to do it too." He walked through the room and indicated four men, who were immediately summoned before the bench. An announcement was then made that Varnell's examination would be suspended, and the clerk was directed to swear the four men.

The first proved to be an uncle of De Martino, and was excused. The second, one Patsy Orlando, testified that he was not related to either defendant, though he had previously told a court attendant he was a relative of the appellant. He was ordered from the courtroom. The examination of the third man, Salvatore Mogagero, was as follows: "By the Court: Q. Are you related to one of the defendants? A. No, sir. Q. Did you tell the court attendant that you were? A. No, sir. The Court: I will hold you for perjury, $1,000 bail. The witness is remanded."

One Frank Maters was next sworn, and testified as follows: "By the Court: Q. Are you related to one of the defendants? A. I am not. Q. Did you tell the court attendant that you were? A. I said we were friends and an uncle. Q. An uncle of whom? A. De Martino. Q. That was true? A. No, sir. Q. That was a lie? A. That is right. The Court: Held for perjury in $1,000 bail. Witness remanded."

This occurrence was, of course, punctuated by repeated objections, exceptions and motions for a mistrial on the part of counsel for the defendants. The attempts of counsel to protect their clients properly on the record were rebuffed with such remarks as " I don't care what you object to. Do not interrupt; " " Be seated;" " Sit down;" " Please attend to your own business." When one of the counsel stated that he could see no basis for the perjury charges and that the accusations were unfair to the defendants, he was met with the questions: " Do you represent these witnesses? " " Are you instructing the Court? " Nothing in the conduct of counsel merited these rebukes. They were within their rights in addressing the court; indeed, in the proper exercise of their duties they could have done no less.

The same episode was revived during the summations, when counsel for Palmeri attempted to caution the jury against prejudice resulting from the perjury charges. He was ordered by the court not to discuss the subject. There followed further exceptions, another motion for a mistrial, and a concluding remark from the court that " You are trying to get the Judge's goat, but you will not succeed."

It cannot be doubted that this departure from orderly trial procedure was calculated to prejudice the jury against the defendants. Except in the case of the first of the four witnesses, who claimed to be an uncle of the appellant, no connection was established between these witnesses and either defendant. Yet the jury might naturally conclude that these were associates of the defendants and had conspired in some manner to obstruct justice. No one should have known better than a judge of a court of criminal

jurisdiction that the charge of perjury was wholly unfounded, yet the court persisted in the error even after his attention had been called to the utter baselessness of the accusation.

Of a comparable character were the activities of the court throughout the examination of each of the appellant's witnesses. The direct examination of the appellant's father, who attempted to support his alibi, was interrupted by such observations as "He will not testify;" "He is trying very hard not to answer." The court then took over the cross-examination of this witness. Every question asked was pregnant with incredulity. Many were calculated to hold the witness up to ridicule and scorn. Again and again the court attempted, though without marked success, to trap the witness into contradictions. The only end accomplished by the questioning was that the court's disbelief in the credibility of the witness was conveyed to the jury just as certainly as if the fact had been proclaimed openly from the bench.

In the examination of the appellant's next witness, Tagriatia, the court went even further into the field of error. This witness had testified only that he lived in the same house with the De Martino family and that he had not worked at his trade as a shoe operator for two years, when the court interrupted his direct examination as follows: "By the Court: Q. Were you working on the 13th of October? A. No, sir. Q. You were out of a job? A. Yes, sir. Q. Do you know Angelo Uale? Mr. Kleinman: I object. The Court: Objection overruled. Mr. Kleinman: I ask your Honor for the withdrawal of a juror and the declaration of a mistrial. The Court: Motion denied. Mr. Kleinman: Your Honor's remark is highly prejudicial. Q. Yes or no. A. Explain to me again. Q. Do you know Angelo Uale by name? That is a simple question. You can answer it if you want to. A. (No answer.) The Court: The witness refuses to answer. The witness: I don't refuse to answer, Judge. The Court: The jury will decide that. By Mr. Kleinman: Q. You heard the Judge's question? The Court: He heard it, all right. Q. Now you say you did not refuse to answer? The Court: The Court requires no assistance. Mr. Kleinman: I am trying to elicit this information now. The Court: All right. The Court does not require assistance. Proceed with your examination. Q. Did you know anybody named Frank Uale? The Court: Frankie Uale was shot and killed. I am asking about Angelo Uale, his brother. By the Court: Q. Did you know anybody named Angelo Uale? A. No, sir. Q. When counsel asked you, you understood the question? A. I wanted it made clear. Q. He used the same words and you answered him? A. I did not know what it means, Uale. Q. You understood perfectly well.

A. That was Frankie Uale that was murdered; I read that in the paper; I did not know the man. Q. I am talking about Angelo, who is still alive. A. I don't know him. Q. You don't know him? A. No, sir."

The sole and evident purpose of these questions was to destroy the credibility of the witness in the minds of the jurors before he had had an opportunity to testify to the facts in issue. The questions were not merely incompetent (*People* v. *Richardson*, 222 N. Y. 103), but prejudicial in the extreme. The court took pains to let the jury know that Angelo Uale was the brother of a murdered gangster. The witness finally succeeded in denying any acquaintance with Uale, but it is obvious that prejudice may result from a question, even though the answer be in form favorable to the witness or the accused. (*People* v. *Davey*, 179 N. Y. 345.)

The court also cross-examined this witness at length at the conclusion of his direct examination, and tried earnestly to discredit him. During this examination the witness was questioned about his association with other underworld characters, though he denied acquaintance with any of them. The same method was followed with the appellant's last witness, Frederick Martino. This witness was the son of the proprietor of a lunch room near the Hollywood Theatre and which the appellant had patronized. He was asked by the court, in a long series of questions, whether the lunch room was a " hangout " for Angelo Uale, Vincent Sebastiano, Anthony De Cuno, Michael De Capulo and William Rupoli. Whether or not these names were familiar to the jury, the innuendo was plain enough that these were thugs and gangsters with whom the witness and the appellant were suspected of associating.

Other examples of undue interference and improper conduct on the part of the trial judge might be cited. In fact, a true picture of the manner in which this trial was conducted can be obtained only by reading the record as a whole. It is sufficient to say, however, that the proceedings disclose no semblance of a fair and impartial trial.

It has been said that, however strong may be the evidence against a defendant, a judgment of conviction should be reversed if the trial was not a fair one. (*People* v. *Wolf*, 183 N. Y. 464.) A fair trial is the fundamental requirement in a criminal prosecution. (*People* v. *Becker*, 210 N. Y. 274, 311.) The essential requirements of a fair trial are simple and easily observed. The function of the trial court is to preserve scrupulously the legal rights of both the People and the accused and not to insure victory or defeat for either contestant. More important than any verdict or judgment are the legal principles which govern the fundamental rights of all.

This court should not countenance such a departure from those principles as this case discloses.

The record shows that the trial court made an attempt to mitigate the effect produced by his conduct of the trial by certain attempted explanations in the charge. It is enough to say that these fall short of curing the errors committed.

We are also of the opinion that there was error in the charge itself. The instruction to the jury that " an alibi is either an alibi or all a lie " was misleading. It appears to mean that the evidence given by alibi witnesses, if not accepted as wholly true, must be rejected as wholly false. That is not a correct statement of the law. The court also erred in charging, on the facts, that the appellant was well known to the two negro porters. The record does not support that statement. Perhaps these errors, standing alone, would not require a reversal. Under the circumstances, they furnish an additional ground for directing a new trial.

The judgment of conviction of the County Court of Kings county should be reversed on the law and a new trial ordered.

HAGARTY, DAVIS, JOHNSTON and TAYLOR, JJ., concur.

Judgment of conviction of the County Court of Kings county reversed on the law and a new trial ordered.