Jesse JOHNSON and Cynthia
Hall, Petitioners,

v.

Charles J. SCULLY, Warden, Green Haven Correctional Facility; and Phyllis Durrly, Correctional Superintendent, Bedford Hills Correctional Facility, Respondents.

Nos. 81 CV 1863, 76 CV 442 (ERN).

United States District Court,
E.D. New York.

April 27, 1983.

Jeffrey A. Rabin, Brooklyn, N.Y., for petitioners.

Elizabeth Holtzman, Dist. Atty., Kings County, by Shulamit Rosenblum, Asst. Dist. Atty., Brooklyn, N.Y., for respondents.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

In 1973, petitioners Jesse Johnson and Cynthia Hall were convicted of criminal possession and sale of heroin in a jury trial in New York State Supreme Court, Kings County. Sentenced to lengthy prison terms, their convictions were affirmed without opinion by the Appellate Division, 46 A.D.2d 739, 361 N.Y.S.2d 325 (2d Dept. 1974), the Court of Appeals denied leave to appeal on February 4, 1975, and the U.S. Supreme Court denied certiorari, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975).

In their first joint petition for habeas corpus, 28 U.S.C. § 2254, Johnson and Hall both alleged that the prejudicial conduct and rulings of the trial judge denied them a fair trial as protected by the due process clause. Finding their claims meritorious,

on February 5, 1979, this Court granted their habeas petitions, and ordered that they be retried within sixty days of that Order or be released. The February 5, 1979 Order, unpublished at that time, follows as Appendix "A" to the present Order.

Respondents simultaneously appealed the Order to the Second Circuit and filed a motion in this Court for relief from judgment under Rule 60(b), F.R.Civ.P., asserting petitioners' failure to exhaust their remedies in State court. Although lacking jurisdiction, in the furtherance of judicial economy, this Court expressed its view that petitioners had exhausted their State remedies. That Order, dated March 28, 1979, also unpublished, follows as Appendix "B". Enforcement of the February 5, 1979 Order was stayed, however, pending appeal.

On appeal, the Second Circuit reversed, holding that petitioners had not exhausted their State remedies. Its precedent-setting opinion, *Johnson v. Metz*, 609 F.2d 1052 (2d Cir.1979), is discussed extensively later in this Order.

Petitioners returned to the New York courts. Their motion to vacate their judgments of conviction was denied as procedurally barred by CPL § 440.10. The Appellate Division denied them leave to appeal, and they again presented their claim to this Court. Constrained by the *Johnson v. Metz* decision and the State court decision on its own procedural rules, *see Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Klein v. Harris*, 667 F.2d 274 (2d Cir.1981), this Court denied petitioners' second habeas petition, by unpublished Order dated June 25, 1982, which follows as Appendix "C".

Petitioners appealed again to the Second Circuit. In this interim, that court issued an *en banc* ruling on the standards for determining whether a claim asserted in a habeas petition has been exhausted in the State courts. *Daye v. Attorney General of the State of New York*, 696 F.2d 186 (2d Cir.1982). Rejecting the standard which had evolved from *Johnson v. Metz*, the court nonetheless distinguished and did not overrule that case. Less than two weeks

later, however, the Second Circuit ordered that Johnson and Hall's petition "be remanded to the district court for further consideration in light of the intervening en banc opinion of this court in Daye." *Johnson v. Scully*, 82 Civ. 2226 (2d Cir., December 22, 1982).

Accordingly, this Court has again reviewed petitioners' original briefs to the Appellate Division. For the reasons that follow, this Court again holds that the claim of prejudicial judicial bias was fully exhausted in the State courts and is an appropriate ground for habeas relief. Finally, as discussed below, the Court has reviewed its February 5, 1979 Order granting the writ, and now reconfirms that decision.

## JOHNSON V. METZ

At issue on this remand is whether petitioners' claim that they were deprived of their constitutional right to a fair trial by the prejudicial conduct of the trial judge was exhausted in the State courts. This issue was resolved against petitioners in *Johnson v. Metz*, a decision whose validity was questioned in *Daye*, 696 F.2d at 195, 197, and was undeniably thrown into doubt by the Second Circuit's decision to remand this petition.

Section 2254(b) of the federal habeas statute states in relevant part that habeas relief cannot be granted "unless it appears that the applicant has exhausted the remedies available in the courts of the State." Neither Johnson nor Hall specifically mentioned the due process clause in their State briefs. Analyzing the cases cited in those briefs, the Second Circuit concluded that petitioners were relying on State law and State court supervisory power for relief. 609 F.2d at 1054. The court held:

> "[T]he construction by this circuit of the meaning of the exhaustion doctrine leads us to conclude that the New York State courts have never been given an opportunity to consider whether the pervasive conduct of the trial judge in this case ... amounted to a violation of federal constitutional due process." *Id.* at 1055 (footnote omitted).

Cognizant of New York's strict post-conviction relief statute, CPL § 440.10, the court did add:

"It is difficult for this panel to believe . . . that no post-conviction remedy whatever will be available by way of state collateral relief when a serious federal constitutional issue is involved.

"We have been cited to no case, nor have we found any, in which the intervention of a trial judge in the conduct of trial has been found so prejudicial as to amount to a violation of constitutional due process. Particularly because of the lack of authority, we think it appropriate that the state court should be allowed, in the first instance, to pass on the constitutional point fairly presented to it. We say this without attempting to suggest the result in this obviously serious case.

"We trust that upon a post-conviction hearing careful attention will be given to this record by the state courts in terms of the serious allegation of constitutional deprivation of the right to fair trial." *Id.* at 1056 (footnote omitted).

As previously noted, however, the New York courts did find petitioners to be procedurally barred from a collateral attack on their convictions. *See* Appendix C.

Concurring, Judge Newman clarified his view of petitioners' claim. Noting that they alleged more than mere excessive judicial intervention, he characterized their petition as asserting that "the nature of all of the trial judge's conduct—his questions, his comments to defense counsel, his comments to the defendants, and his comments to the jury—combined to deny petitioners the 'fair trial in a fair tribunal' that is 'a basic requirement of due process.'" 609 F.2d at 1057 (citation omitted). He added, "A claim of this nature is well within the mainstream of due process adjudication." *Ibid.*

## DAYE V. ATTORNEY GENERAL

### THE *DAYE* PANEL DECISION

William Daye, convicted of intentional murder, felony murder, and armed robbery in the Supreme Court, New York County, brought a habeas petition in federal court alleging that his sixth and fourteenth amendment rights to a fair and impartial trial had been violated by the conduct of the trial judge. Daye had not specifically cited the federal Constitution in his State briefs. The district judge held that Daye had nonetheless exhausted his State court remedies because the very nature of Daye's claim alerted the State courts to a constitutional question. *Cf. Twitty v. Smith,* 614 F.2d 325 (2d Cir.1979) (claimed lack of "effective assistance of counsel" impliedly raised sixth amendment issue). Reaching the fair trial issue, the judge dismissed Daye's petition as meritless. *Daye,* 663 F.2d 1155, 1156 (2d Cir.1981).

A divided *Daye* panel affirmed the dismissal but without prejudice to the merits. Writing for the court, Judge Newman stated the Second Circuit rule that "the exhaustion requirement is not satisfied unless the habeas petitioner explicitly refers to a federal constitutional standard in presenting his claim to the state courts." *Id.* at 1155. Judge Newman traced this rule to the *Johnson v. Metz* decision:

"Just two years ago we applied this strict approach to exhaustion to a habeas corpus petition indistinguishable from Daye's. *Johnson v. Metz,* 609 F.2d 1052 (2d Cir.1979). Like Daye, Johnson sought habeas corpus relief because of the excessive and prejudicial intervention of the state court trial judge, and, like Daye, his state court briefs, which made no express mention of the Sixth and Fourteenth Amendments, referred to the denial of a fair and impartial trial and characterized a fair trial as a fundamental element of the judicial process. Though the District Court in *Johnson* had concluded that the exhaustion requirement had been met and that the petitioner was entitled to relief on the merits, this Court reversed, ruling that Johnson had not presented a federal constitutional claim to the state courts. Even though Johnson's brief in the Appellate Division cited ten decisions of federal courts, his fair trial claim was deemed to be an appeal only to state law or to the supervisory power of the state appellate courts, and thus not the 'same

claim,' *Picard v. Connor,* 404 U.S. 270, 276 [92 S.Ct. 509, 512, 30 L.Ed.2d 438] (1971), that he was presenting to the federal courts. *Johnson v. Metz, supra,* 609 F.2d at 1054." *Id.* at 1157.

Judge Newman continued by effectively criticizing the strict labeling requirement. First, he observed that renewed consideration of expressly labeled federal claims did not meet notable State court enthusiasm. He added:

"Nor is there much reason to believe that the articulation of facts (here, excessive and prejudicial court questioning) and consequence (here, denial of a fair and impartial trial) are inadequate to afford state courts, fully aware of their constitutional responsibilities, a fair opportunity to decide whether a conviction accords with constitutional requirements." *Id.* at 1157.

He also expressed concern that a pleading deficiency could cause a delay of years in vindicating a meritorious claim, or could cause the claim to be forever forfeited. Bound by *Johnson v. Metz,* however, Judge Newman concluded:

"Whatever our disagreements with an exhaustion requirement that entails explicit labeling of a federal claim, we are obliged to affirm this judgment without prejudice, solely on grounds of failure to exhaust state court remedies, and await a petition suggesting rehearing *en banc,* which we assume Daye will present." *Id.* at 1158.

In contrast, Judge Metzner agreed with the district judge that Daye's petition lacked merit, and argued that, in the interests of judicial economy, the exhaustion requirement should not apply to meritless claims. Concurring with Judge Newman, however, that the *Johnson v. Metz* standard dictated dismissal, Judge Metzner added that he found that "the exhaustion requirement in this circuit exalts form over substance." *Id.* at 1158.

Judge Lumbard dissented, stating that he would find that Daye's claims had been adequately presented to the State courts and that Daye's habeas petition should be granted. On the exhaustion issue, he observed that Daye's State briefs "repeatedly argued that the trial judge's questioning 'deprived the defendant of his right to a fair trial.'" *Id.* at 1160. Daye had also cited two New York cases which analyzed fair trial claims on federal constitutional grounds, *People v. DeJesus,* 42 N.Y.2d 519, 399 N.Y.S.2d 196, 369 N.E.2d 752 (1977); and *People v. Crimmins,* 36 N.Y.2d 230, 367 N.Y.S.2d 213, 326 N.E.2d 787 (1975), and Judge Lumbard found these citations "sufficient to alert the Appellate Division of his federal law claims." *Id.* Distinguishing *Johnson v. Metz,* Judge Lumbard noted the *Johnson v. Metz* panel's observations that Johnson and Hall had only cited cases that rested on State law or appellate court supervisory power. Moreover, Judge Lumbard noted that Daye's brief cited prior cases in which the same trial judge had been reversed for excessive questioning, which he stated was not a factor in *Johnson v. Metz.*

## THE *DAYE EN BANC* DECISION

The *Daye* case was reheard by an eleven-member *en banc* panel, and ten judges joined in an opinion clarifying the Second Circuit's criteria for determining whether the State remedies have been exhausted. Holding that a habeas petitioner need not have cited "'book and verse on the federal constitution'" to the State courts, 696 F.2d at 192 (quoting *Picard,* 404 U.S. at 279, 92 S.Ct. at 514), the court summarized:

"[T]he ways in which a state defendant may fairly present to the state court the constitutional nature of his claim ... include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like factual situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* at 194.

For two reasons, the court held that Daye's claim had been fairly presented to the State courts.

First, Daye had cited State cases which addressed similar fact patterns and rested on constitutional grounds. Specifically, the court noted Daye's citation to *DeJesus* and *Crimmins*. *Id.* at 195–96. In *DeJesus,* the New York Court of Appeals had held that a trial judge's excessive intervention had denied a criminal defendant of a fair trial. Citing federal constitutional cases, the New York court depicted the right to a fair and impartial trial as " 'the law of the land' " and "the most fundamental of all freedoms." 42 N.Y.2d at 520, 399 N.Y.S.2d at 197, 369 N.E.2d at 753. In *Crimmins,* a case which did not involve judicial intervention, the New York Court of Appeals *in dicta* noted that the constitutional right to a fair trial was so fundamental as to require the appellate court to reverse "quite without regard to any evaluation as to whether the errors contributed to the defendant's conviction. The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right." 36 N.Y.2d at 237–38, 367 N.Y. S.2d at 219, 326 N.E.2d at 793.

Distinguishing *Johnson v. Metz,* the court noted that neither the *DeJesus* and *Crimmins* decisions, nor the New York Court of Appeals decision in *People v. Mees,* 47 N.Y.2d 997, 420 N.Y.S.2d 214, 394 N.E.2d 283 (1979), which also found excessive judicial intervention to be unconstitutional, had been decided when Johnson's and Hall's convictions were appealed through the State courts. The *Johnson v. Metz* panel, the *Daye* court noted, had stated that no cases holding that judicial intervention could rise to a due process violation had been cited to it. *Id.* at 196. Moreover, the *Daye en banc* court found that the *Johnson v. Metz* decision did not expressly impose the strict labeling standard; rather, it appeared to allow for an analysis of cases cited in State briefs. In fact, the *Johnson v. Metz* panel stated that it had considered the cases cited in petitioners' State briefs and had found them to rely on appellate court supervisory powers. *Id.* at 195.

Second, Daye's State claim centered on "the trial judge's evident partiality and his assumption of a hostile and prosecutorial stance," which the Second Circuit held to be "sufficient to alert the state court that a federal due process claim was being asserted." *Id.* at 196. In support, the court noted "a long line of cases" establishing the right under the due process clause to a trial before a neutral judge. The fair trial right was so fundamental, the court added, that "not even the appearance of bias is tolerated." *Id.* at 196. The court concluded:

"We regard it as immaterial that none of these cases dealt with a bias manifested through allegedly excessive and one-sided intervention in the trial. The gravamen of a claim of denial of fair trial due to judicial bias does not depend on the source of the bias or the manner of its manifestation. If judicial bias, or the appearance of it, existed, due process was denied. We do not believe it reasonable to assume that state judges presented with a claim of manifested judicial bias would fail to recognize the implication of due process rights simply because half a century of due process cases dealt with the mere risk of bias or with actual bias manifested in other ways." *Id.* at 197.

Daye's briefs, the court noted, included contentions that the trial judge must " 'be scrupulously free and above even the appearance or taint of partiality,' " and that the judge at his trial " 'set impartiality aside in favor of the prosecution' "; " 'assumed the role of prosecutor' "; " 'demonstrated to the jury that [he] believed the defendant to be guilty' "; and " 'blatantly and repeatedly indicated [his] disbelief in the defendant's testimony.' " These statements, among others, apprised the State courts of the constitutional aspects of Daye's claim. *Id.* at 197.

Finally, questioning but not expressly overruling *Johnson v. Metz,* the court stated:

"[T]o the extent that *Johnson v. Metz* actually construed Johnson's claim as one of bias (i.e., denial of an 'impartial' trial, ...), rather than one simply complaining of 'the overall conduct of the trial judge,' ... we disagree with its conclusion that the claim as one with constitutional

thrust was 'novel,' and with its decision to 'giv[e] the state court the first opportunity to pass on whether or not the novel constitutional point is "within the mainstream of due process adjudication." ' " *Id.* (citations omitted).

## IN LIGHT OF *DAYE*

As Judge Newman observed in writing the *Daye* panel decision, Johnson and Hall's petition is "indistinguishable from Daye's." 663 F.2d at 1157. For the same reasons that the *Daye en banc* court held that Daye had adequately presented his claims to the State courts, this Court finds that Johnson's and Hall's briefs to the Appellate Division were sufficient to exhaust their State remedies.

First, Johnson's and Hall's State briefs both present claims which rest "on a factual matrix that is 'well within the mainstream of due process adjudication.' " *Daye,* 696 F.2d at 193; *see Johnson v. Metz,* 609 F.2d at 1057 (Newman, J., concurring). Both briefs, like Daye's, contended that the trial judge's bias was reflected in how he conducted their trial and deprived them of a fair trial.

Johnson's brief argued that the "prejudicial attitude of the trial court ... permeated the entire proceeding," Johnson App. Div. Brief at 10, and that the trial judge's intervention amounted to "judicial emphasis necessarily consistent with judicial partiality with the prosecutor." *Id.* at 25. Johnson asserted that, by his questions and comments, the trial judge "usurped the function of the prosecutor," *id.* at 13, "identified himself with the prosecutor's theory," *id.* at 24, "argued on behalf of the district attorney," *id.,* and made "remarks [that] smack[ed] of a prosecutorial summation." *Id.* at 15. Johnson claimed that "[t]he courtroom was permeated with an atmosphere of judicial prosecution," *id.* at 23, which amounted to "the antithesis of impartiality." *Id.* at 19; *accord, e.g., id.* at 18, 19, 20, 23, 25, 26–27, 28, 29, 41.

Specifically, Johnson argued that the trial judge's questions and comments bolstered the credibility of the prosecution's witnesses, emphasized and endorsed the prosecutor's theories, and undermined cross-examination. *E.g., id.* at 9, 11, 13, 14, 15, 17, 19, 20, 22, 23, 24, 25, 26, 29, 31, 32, 34, 35, 36, 37, 41, 42, 43. For example, Johnson argued:

> "By repeating the testimony of the prosecution's main witness, the court hammered it home to the jury as if it were coming from [the judge], indelibly clothing it with judicial endorsement. *Id.* at 13.

\* \* \* \* \* \*

> "When a jury hears a judge preface his questioning of a witness with 'just listen to my questions,' they are invited, if not obligated, to conclude that, with the help of the court, they are receiving the truth. *Query, is this consistent with the principles of a fair trial?* " *Id.* at 16 (emphasis supplied).

Moreover, Johnson claimed that the trial judge admitted clearly irrelevant evidence and hearsay testimony " 'to allow ... any inference the district attorney seeks to draw.' " *Id.* at 12 (quoting trial transcript).

Johnson also cited examples of the trial judge challenging the credibility of his co-defendant Hall, *id.* at 34, attacking the trial tactics of defense counsel and even refusing to allow defense counsel to state the grounds for objections on the record, *e.g., id.* at 22, 23, 24, 26, 29, 30, 35, 39, 42, and denying requests to exclude the jury, *e.g., id.* at 30, 40. Most strikingly, Johnson repeatedly noted instances where the trial judge's comments seemingly eviscerated Johnson's entrapment and agency defenses. *Id.* at 9, 11, 17–18, 28, 32–33, 34, 37, 43. As Johnson argued: "If a judge suggests that a witness [here, a police officer] acted properly in the eyes of the law, thereby judicially endorsing his credibility, how can the defense of entrapment survive?" *Id.* at 9. Johnson's arguments do not challenge mere excessive judicial intervention; rather, his brief is replete with contentions of manifest judicial bias. *See* Appendix B at 879–880.

Hall's brief similarly attacks the trial judge's conduct, which she asserted "unduly

influence[d] the Jury and ... deprive[d] the Appellant and the Co-Defendant Johnson of the rudimentary fair trial to which they were entitled, a right given to them regardless of the strength of the People's case." Hall App.Div. Brief at 41. Her citations to the trial record paralleled Johnson's, and in her four-page summary of the trial judge's controversial conduct, she included contentions that he

"injected the question of the race of the Defendants, the undercover Officer, and the informant, for no reason whatsoever, ... interrupted the Appellant's attorney during his question of her ... and then again interrupted the Appellant during her cross-examination on another totally unrelated subject to ask her a question which clearly showed to the Jury that the Court did not believe her testimony on the most crucial issue in her case, ... and then commented on the Appellant's living with another man, saying, 'a woman who cares so little about morals, does she worry about lying?' ... again, during the District Attorney's summation, the Court told the Jury that the District Attorney's argument is 'perfectly reasonable.'" *Id.* at 40.

In the same line, she added:

"There are numerous instances throughout the record where the Court gave the Jury, whether intentionally or not, the clear impression that it believed the Defendants guilty. A striking example is contained on page 2310 where the Court interrupted the Appellant's testimony about an innocuous matter to ask her, in tones of disbelief, which can be heard without having been present in the Courtroom, whether she was curious about what was in the knapsack. This was a proper subject of cross-examination by the District Attorney, and by interjecting the question, at that particular time, the Jury would have to be blind and deaf not to comprehend that the Judge thought the Appellant's testimony incredible." *Id.* at 41.

Hall, like Johnson, cited to the admission of hearsay and other challenged evidence to further her argument that the trial, considered in its totality, was conducted in a prejudicial manner. *Id.* at 43. Interestingly, Hall further alerted the State courts to the nature of her claim by citing *People v. Baker,* 44 A.D.2d 83, 353 N.Y.S.2d 505 (2d Dept.1974), a case in which a conviction was reversed as a result of the biased conduct of the very judge who presided over Johnson and Hall's trial. Hall App.Div. Brief at 37.

Hall's State brief implies that the trial judge may not have intentionally conveyed his predetermination of guilt to the jury. Her arguments to the Appellate Division leave no doubt, however, that she was contending that the trial judge in fact did not believe the defendants, and that his conduct at trial communicated his disbelief to the jury. Hall's State brief, like Johnson's, rested on an allegation of manifest judicial bias and not mere excessive intervention.

Johnson's and Hall's State briefs used almost the identical phrases to describe the challenged actions of the trial judge that the *Daye en banc* court held adequate to alert the State courts of "the constitutional implications" of the fair trial claim. 696 F.2d at 197. According to the exact analysis applied to the *Daye* petition, Johnson and Hall's constitutional claim was clearly before the State courts, and their State remedies have therefore been exhausted.

Moreover, despite the *Johnson v. Metz* panel's conclusion that the cases cited in petitioners' briefs were grounded in the supervisory powers of appellate courts, this Court's review of those cases, particularly in light of intervening decisions, indicates that petitioners' citations should have made the State courts cognizant of their constitutional responsibilities. The appellate courts in the cases cited by Johnson and Hall certainly exercised their supervisory powers, but they did so to correct constitutional defects.

Several of the New York cases cited by Johnson reversed convictions in the face of a record of excessive or prejudicial intervention because the fair trial right was "basic" or "fundamental." *E.g., People v. Mleczko,* 298 N.Y. 153, 163, 81 N.E.2d 65

(1948) ("Vicious though the crime was, convincing though the evidence seems to be, we could affirm only if we were to announce a doctrine that the fundamentals of a fair trial need not be respected if there is proof in the record to persuade us of defendant's guilt."); *accord, People v. Schildhaus,* 17 Misc.2d 825, 186 N.Y.S.2d 68, 70 (1st Dept.1959); *People v. Dovico,* 6 A.D.2d 457, 179 N.Y.S.2d 379, 380 (4th Dept.1958); *People v. Herman,* 255 App.Div. 314, 7 N.Y. S.2d 560, 562–63 (2d Dept.1938); *People v. Rafkind,* 254 App.Div. 742, 3 N.Y.S.2d 997, 998 (2d Dept.1938); *People v. Konopka,* 5 Misc.2d 507, 164 N.Y.S.2d 139, 142 (Suffolk County Court 1957); *People v. Man,* 5 Misc.2d 852, 165 N.Y.S.2d 783, 784–85 (Suffolk County Court 1956); *People v. Kachadourian,* 116 N.Y.S.2d 486, 491–92 (Broome County Court 1952). For example, in *People v. DeMartino,* 252 App.Div. 476, 299 N.Y.S. 781, 787 (2d Dept.1937), the court stated:

> "[H]owever strong may be the evidence against a defendant, a judgment of conviction should be reversed if the trial was not a fair one.... A fair trial is the fundamental requirement in a criminal prosecution.... The essential requirements of a fair trial are simple and easily observed. The function of the trial court is to preserve scrupulously the legal rights of both the people and the accused and not to insure the victory or defeat for either contestant. More important than any verdict or judgment are the legal principles which govern the fundamental rights of all."

Although none of these cases expressly cited the Constitution, their analysis appears indistinguishable from the rationale adopted by the New York Court of Appeals in *Crimmins,* 36 N.Y.2d at 238, 367 N.Y.S.2d at 218–19, 326 N.E.2d at 792–93, and *DeJesus,* 42 N.Y.2d at 520, 522–24, 399 N.Y.S.2d at 197, 198–99, 369 N.E.2d at 753, 754–55, as discussed in *Daye,* 696 F.2d at 195–96. The *DeJesus* decision, rendered subsequent to the *Johnson v. Metz* decision, demonstrates that the analysis contained in Johnson's and Hall's State briefs, and in the State cases they cited, depicted a constitutional claim.

*See also Mees,* 47 N.Y.2d at 998, 420 N.Y. S.2d at 215, 394 N.E.2d at 284.

Moreover, although the majority of the federal cases cited by Johnson and Hall do not expressly mention the Constitution, these cases similarly treat the right to a trial before an impartial judge as fundamental. *E.g., United States v. Fernandez,* 480 F.2d 726, 738 (2d Cir.1973) ("we doubt that a guilty verdict after the judge had told the jury that he considered a defense witness an unmitigated liar would be sustained by the Supreme Court today."); *United States v. Guglielmini,* 384 F.2d 602, 605 (2d Cir.1967) ("the defendants did not receive the fair trial to which our law entitles them."), *cert. denied,* 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970); *United States v. Hill,* 332 F.2d 105, 106 (7th Cir. 1964) (" 'a fair and impartial trial is guaranteed to every defendant, and fundamentally means a trial before an impartial judge and by an impartial jury.' "); *United States v. Carmel,* 267 F.2d 345, 350 (7th Cir.1959) (same); *United States v. Hunter,* 62 F.2d 217, 220 (5th Cir.1932) ("It is vastly more important that the attitude of the trial judge should be impartial than that any particular defendant, however guilty he may be, should be convicted."); *see Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed.2d 841 (1894), *quoted in Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933); *United States v. Nazarro,* 472 F.2d 302, 303–04 (2d Cir.1973); *United States v. Grunberger,* 431 F.2d 1062, 1067, 1069 (2d Cir.1970); *United States v. DeSisto,* 289 F.2d 833, 835 (2d Cir.1961); *United States v. Marzano,* 149 F.2d 923, 926 (2d Cir.1945).

In two cases cited by Hall, however, the courts did state that the deprivation of fair trial claims had been raised to vindicate constitutional rights, and analyzed the claims accordingly. In *United States v. Lanham,* 416 F.2d 1140, 1145 (5th Cir.1969), the court concluded that:

> "The impartial trial atmosphere, the cold neutrality of an impartial judge, the defendant['s] ... credibility, his presumption of innocence, and any chance wheth-

er guilty or innocent that he had of a successful defense, all were denied, along with his Fifth Amendment right not to be deprived of his liberty without due process of law."

Additionally, in *Bursten v. United States,* 395 F.2d 976, 982–83 (5th Cir.1968), *cert. denied,* 409 U.S. 843, 93 S.Ct. 44, 34 L.Ed.2d 83 (1972), the court addressed the "contention that on many, many occasions the trial judge over-stepped the bounds of judicial propriety, by repeatedly injecting himself into the trial, in questioning the witnesses and wrongly expressing his personal opinions" in disregard of basic principles encompassed in "the fair trial rights … guaranteed by the Constitution."

Johnson similarly cited *United States v. Hoker,* 483 F.2d 359, 360 (5th Cir.1973), which in turn quoted and relied upon *Lanham, supra.* In fact, Johnson's brief to the Appellate Division expressly stated that "[t]he totality of the circumstances … denied the Defendant his *constitutional* right to a fair trial." Johnson App.Div. Brief at "Table of Contents" and at 72 (emphasis added); *see* Appendix B at 879.

Additionally, in dismissing the present petition to allow the State courts to address the express constitutional claim, Judge Newman, concurring in *Johnson v. Metz,* characterized the nature of that claim by quoting *United States v. Marzano,* 149 F.2d at 926:

"Petitioners' claim, now returned for what will surely be sensitive examination by the state courts, is that the trial judge failed to observe the enduring admonition of Judge Learned Hand: '[The trial judge] must not take on the role of a partisan; he must not enter the lists; he must not by his ardor induce the jury to join in a hue and cry against the accused. Prosecution and judgment are two quite separate functions in the administration of justice; they must not merge.'" 609 F.2d at 1057.

Judge Newman apparently viewed the *Marzano* case as establishing the constitutional framework in which the State courts should address Johnson and Hall's due process claim. Notably, Johnson's State brief had also quoted *Marzano.* Johnson App. Div. Brief at 48.

■ Johnson and Hall thus appear to have cited cases, both State and federal, that are in the long line of precedents safeguarding a constitutional right to a fair trial. For this reason, and because both petitioners' State briefs cast their claim in language which places it in the mainstream of due process, and because Johnson's brief expressly refers to the Constitution, this Court finds that petitioners exhausted their State remedies on this claim.

## THE FAIR TRIAL CLAIM

Petitioners have steadfastly sought habeas relief because they claim that they were denied a fair trial in contravention of the due process clause. The Court has reviewed its February 5, 1979 Order holding that petitioners were entitled to habeas relief, and the Court now adopts that holding for the reasons expressed in that Order. *See* Appendix A.

■ Defendants incorrectly contend that the 1979 Order rested on four grounds to support the grant of the writ. In the March 28, 1979 Order, this Court expressly stated that although petitioners "advanced four constitutional grounds in support of their petition, only one—their claim that the State trial judge conducted their trial in a manner inconsistent with their due process right to a fair trial—forms the basis for the order conditionally granting the writ." Appendix B at 878. To the extent that the February 5, 1979 Order alluded to other constitutional deficiencies in petitioners' trial, those findings are provided only as support for the holding that the trial judge's actions, considered in their totality, deprived petitioners of a fair trial. By letter dated February 24, 1983, petitioners abandoned all other claims. *Cf. Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 371 (1982).

The petition is conditionally granted solely because petitioners were deprived of their due process right to a fair and impar-

tial trial; of course, the Court anticipates that if the State elects to retry either or both petitioners, it will do so in a manner not inconsistent with the Court's citation to other obvious constitutional defects in their first trial. See Appendix A.

Accordingly, defendants are ordered to release petitioners from custody and to relieve them from all disabilities attributable to this conviction unless the State grants them new and separate trials within sixty (60) days.

SO ORDERED.

## APPENDIX A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –x

JESSE JOHNSON and CYNTHIA HALL, :

Petitioners, :

–against– :

PAUL METZ, Warden, Great Meadows Correctional Facility; JANICE WARNE, Correctional Superintendent, Bedford Hills Correctional Facility, :

Respondents. :

– – – – – – – – – – – – – – – –x

76 C 442

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

Petitioners Jesse Johnson and Cynthia Hall, State prisoners, seek a writ of habeas corpus, alleging they were denied due process of law in their State trial by reason of claimed prejudicial conduct and rulings on the part of the trial judge which, they contend, deprived them of a fundamentally fair trial and their right of confrontation. They were each charged in separate identical indictments with a single sale and possession of a quantity of heroin and, on motion of the District Attorney, were tried jointly before a jury in the New York Supreme Court, Kings County, in August 1973 and found guilty. They were sentenced by judgment entered October 16, 1973, and their convictions were affirmed by the Appellate Division, without opinion, 46 App. Div.2d 739, 361 N.Y.S.2d 325 (2d Dept.1974);

leave to appeal to the Court of Appeals was denied by Judge Wachtler on February 4, 1975, and the Supreme Court thereafter denied certiorari, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975).

Petitioners' principal claim is that they were deprived of a fair trial by the trial judge's usurpation of the prosecutor's function and constant interference in the trial, which inevitably manifested to the jury the court's belief in their guilt. Additional claims of Johnson are that he was denied the right of confrontation by the erroneous admission of prejudicial hearsay testimony and subjected to the burden of proving his innocence by erroneous jury instructions on the defense of entrapment. Hall, who testified in her own defense, additionally claims that the joint trial, the trial judge's conduct in cross-examining her and the use of certain claimed impeachment evidence, which the court had ruled inadmissible before she took the stand, made a fair consideration of the evidence as to her impossible under the circumstances.

Although only a single heroin transaction formed the basis of the charges against both petitioners, the trial extended from July 30, 1973 to August 22, 1973—over three weeks. In that time some 2,713 pages of transcript were compiled, although only six witnesses testified: four police officers and a police chemist for the State, and petitioner Hall in her own defense. The length of the trial was in large part attributable to the extraordinary intervention of the trial judge in the conduct of the State case, the resulting frequent colloquies and controversies between the judge and defense counsel—mostly in the presence of the jury—and the court's repetitious explanations to the jury of what the prosecutor was attempting to prove. In contrast to some 1,099 questions put by the prosecutor, the trial judge asked about 1,254 questions. Between them, the two defense counsel asked approximately 1,108 questions.

*The Evidence at Trial*

From the evidence at trial it appears that in July 1972 Richard Brown, a New York City police officer, assumed the role of an

undercover agent for the police narcotics bureau. According to Brown, two fellow officers, Martinez and Matera, had informed him that petitioner Johnson was a large-scale narcotics dealer in the Bedford-Stuyvesant area of Brooklyn, and Brown's objective was to attempt to arrange a narcotics transaction with him. Brown subsequently met with one Julius "Pete" Knight, a registered Police Department informant, who told Brown he had worked for Johnson for ten years and could bring about an introduction.

From July 1972 until February 1973, Brown, using the name "Grady" and a cover story that he was a prosperous dealer from Washington, D.C. looking to buy heroin, stalked the streets without result. Although Brown had "investigated" a catering hall Johnson owned and had seen him on September 14, 1972 at the grand opening of a Brooklyn bar called the "Motown Lounge," also attended by Knight, no progress had been made towards an actual introduction of "Grady" to Johnson. Finally, on February 21, 1973, Knight took Brown to Johnson's home in Queens. There is no direct evidence as to how this home visit was arranged.[1] Johnson was asleep when they got there but Mrs. Johnson let them in. Anticipating the conversation hereinafter related, Brown had a tape recorder concealed on his person. Surveilling police officers in a car were nearby to take photographs of Brown and Knight entering and leaving the house.

According to Brown and the tape transcript, when Johnson appeared, Knight opened the relevant conversation by saying, "I want to talk to you about a little stuff," meaning heroin in street parlance. The conversation as recorded continued for some time with Knight urging Johnson to get some heroin for "Grady" as he, Knight, wanted to make some money. Johnson at first demurred, saying, "It's too hot ... with stuff now.... Your ass would be in jail in a minute as soon as you turned

around." Nevertheless, Johnson finally agreed he would get three-quarters of a kilo of heroin for "Grady" for $23,000. Johnson cautioned Knight, saying, "Look, Pete, if I get this stuff for this boy, I don't want to hear my name on Fulton Street ... because that [obscenity meaning drugs] put me in trouble." The conversation ended with Johnson saying he would see Knight and "Grady" at the Motown Lounge in a couple of days.

On February 23, 1973 Johnson appeared at the Motown Lounge. Brown and Knight were already there as was another undercover police officer, Dorothy Richardson, posing as "Grady's" girlfriend. Brown had $23,000 in serialized bills obtained from the Police Department, which were in a green knapsack in the trunk of a rented new Cadillac Brown used in order to impress Johnson. He also had his concealed tape recorder. Johnson expressed doubt about dealing with Brown, but after Brown complained "if you don't dig me, we can just forget it," Johnson asked if he had the money. Brown took him outside to the Cadillac, showed him the money in the knapsack and placed the knapsack inside a brown paper bag behind the driver's seat of Johnson's car. Johnson then drove off after instructing Brown to be at the Motown Lounge at 3 P.M.

Surveilling police officers, who were photographing Brown's and Johnson's movements, observed Johnson drive to an apartment house at 950 Rutland Road, Brooklyn. Johnson and his wife had leased an apartment there, which was occupied from time to time by co-petitioner Hall, admittedly Johnson's girlfriend. The surveilling officers also observed Johnson enter the building carrying a brown paper bag and later emerge accompanied by Hall. One of the officers testified he saw Hall carrying a green knapsack over her shoulder as she walked towards Johnson's car and then both drove off.

---

1. Brown's testimony on cross-examination that Johnson had a conversation with Pete Knight was obvious hearsay. Brown admitted he had not been personally invited. R. 1502, 1504.

References "R. ——" are to pages of the reproduced record on appeal provided by the State Attorney General.

Johnson drove past the Motown Lounge to the Centaur Club a block away. Hall, who took the stand in her own defense and denied the accuracy of the surveilling officers' observations, testified she first saw the green knapsack when Johnson reached underneath the driver's seat and handed it to her, telling her to sit in the Centaur Club and when "Pete" Knight arrived to give him the knapsack and then return to the Motown Lounge. Johnson then drove off.

According to Officer Brown, Johnson returned to the Motown Lounge about 3:15 P.M. Brown was seated at the bar with Knight and Officer Richardson. When Johnson came in he whispered something to Richardson and she and Knight immediately left the Lounge. Richardson, who also had a recording device concealed on her person, testified that Johnson told her "Go down to the bar up the street."

Richardson and Knight walked to the Centaur Club where, according to Richardson, they saw Hall seated at the bar with "a green knapsack bag in her lap." Richardson testified she approached Hall, whom she had never seen before, said "Hi" and put out her hands to take the knapsack from Hall. Hall's testimony was that the knapsack was not in her lap but laying on the bar, and that after a brief social conversation with Knight, whom she knew, he told Richardson to take the bag for him. When Richardson remonstrated that she already had a shoulder bag and was having difficulty getting the knapsack under her coat, she testified that Hall suggested wearing both bags over her shoulder—a remark corroborated by Hall in her testimony. Officer Richardson also testified she was unaware of the knapsack's contents.

Richardson and Knight returned to the Motown Lounge where Richardson gave the green knapsack to Officer Brown at the rear of the Lounge. There Brown opened the knapsack and saw two sealed plastic bags of brown powder, which a police chemist later testified contained heroin. Hall soon arrived at the Motown Lounge and after having some drinks with the group she left with Johnson. Brown, Richardson and Knight departed shortly thereafter.

Johnson was indicted on March 7, 1973, Hall on March 13. On March 12 the police had searched the Rutland Road apartment pursuant to a warrant alleging the belief that narcotics were there. They found none but seized over $2,000 in cash, a small scale, some boxes of glucose, and some "white powder" in a plastic bag, which Hall testified was flour. There was no claim that the cash seized was part of the serialized currency Brown had given Johnson. Both defendants were arrested after the search.

*Johnson's Claims*

Johnson offered no evidence at trial but based his defense on contentions of entrapment and agency as shown by the prosecution's evidence. Obviously, these defenses were virtual admissions of Johnson's involvement in a heroin transaction, as his counsel recognized in summing up to the jury:

> "Yes, he did do what the State says he did; but even though he did it, he was entrapped into doing it; and even though he did some of the things that the State says he did, he was acting as an agent of the buyer." (R. 2388.)

In the circumstances of this case, the defenses were appropriately raised, since it is "the established New York rule that one who acts solely as the agent of a purchaser of narcotics cannot be convicted of the crime of criminal sale of a controlled substance." *People v. Roche*, 45 N.Y.2d 78, 407 N.Y.S.2d 682, 379 N.E.2d 208 (decided June 15, 1978). Nor may a defendant be convicted if by a preponderance of the evidence it is established that he "engaged in the proscribed conduct because he was induced to do so by a public servant, or by a person acting in cooperation with a public servant, seeking to obtain evidence against him for purpose of criminal prosecution ... [and was] not otherwise disposed to commit it." N.Y. Penal Law § 40.05.

It is Johnson's primary claim that the number, tenor and tone of the trial judge's interjections throughout the trial unmistakably reflected a partisan attitude and con-

veyed to the jury the judge's belief that he was guilty, thereby destroying any impartial consideration of his defenses. Such a claim places this court in the unenviable position of reviewing the conduct of a State judge on the basis of a cold record, while aware that it is not uncommon for a defendant to blame the trial judge for the jury's verdict of guilt. But although the task is not an agreeable one, the court must discharge its responsibility under the United States Constitution and 28 U.S.C. § 2254. After a searching review of the record of the State trial, and the briefs and affidavits on behalf of the State Attorney General and the petitioners, the court is unable to avoid the conclusion that the State judge's conduct of the trial, however unintended, so seriously prejudiced each petitioner's right to a fair and impartial trial as to deny them due process in any meaningful sense.

The record is rife with instances of the trial judge, himself a noted former District Attorney, taking over the direct examination of prosecution witnesses and conducting cross-examination of petitioner Hall when she testified in her own defense. Brown, the State's chief witness, no sooner assumed the stand than the judge took over his examination after defense counsel objected to hearsay conversations about Brown's special training as an undercover police officer. In overruling that objection, the judge commented to the jury

> "I am allowing this testimony ... [for] you have to decide, ladies and gentlemen of the jury, where the truth lies, who is telling the truth, and *in order for you to find out who is telling the truth, you have to know something about the background of the person who is talking, his experience in matters of that sort* ... which will enable you, I think, better to judge whether he is lying, or whether he is mistaken in his testimony." (R. 769, emphasis supplied.)

The judge then went on for almost four pages of what he recognized as "leading questions" to Brown regarding police organization, the role of the narcotics squad and Brown's special training for police undercover work. R. 770–73. No sooner had the prosecutor resumed direct examination than the judge, apparently dissatisfied with his approach, began suggesting what questions to ask, again interspersing his own questions, and eventually taking over and bringing out in more detail what Brown was called upon to do as an undercover officer. R. 774–82.

If the court's questions had been "necessary to elicit significant facts, to clarify or enlighten an issue or merely to facilitate the orderly and expeditious progress of the trial," see *People v. Ohanian*, 245 N.Y. 227, 232, 157 N.E. 94 (1927); *People v. Hinton*, 31 N.Y.2d 71, 74, 334 N.Y.S.2d 885, 286 N.E.2d 265 (1972), *cert. denied*, 410 U.S. 911, 93 S.Ct. 970, 35 L.Ed.2d 273 (1973); and *People v. Mendes*, 3 N.Y.2d 120, 121, 164 N.Y.S.2d 401, 143 N.E.2d 806 (1957), there would be no ground for complaint. But here the trial judge continually displaced the prosecutor for none of those reasons but simply to drive home the theory of the prosecution in presenting its evidence. Repeatedly, at critical points, as Brown's direct testimony continued, the judge took over the questioning, bringing out that Brown had been told by fellow police officers that Johnson "was a large-scale narcotics dealer in the Brooklyn area" (R. 790); that Brown had presented himself to petitioner as a drug dealer from Washington, D.C. (R. 823–24); and that Brown had made a purchase of "stuff"—meaning narcotics—from Johnson on February 23rd, as charged in the indictment (R. 841–42). The judge's questions so pervade the record that it is difficult to select particular examples for quotation. To avoid unduly prolonging this decision, relevant record references are noted in the margin.[2] Suffice it to say that

2. Examples of the judge displacing the prosecutor in the direct or redirect examination of the People's witnesses are found at the following pages of the record: 848, 849; 870–73; 877–78; 901–03; 907–09; 913–14; 915; 931–36; 944–46; 971; 972; 973; 974–76 (additional "leading" questions by the court); 983; 986–88; 991–92; 993–94; 999–1003; 1003–06; 1013–17;

the obvious effect of the judge's assumption of the prosecutor's role was to clothe Brown and his fellow officers with indestructible credibility in the eyes of the jury and thereby foreclose any fair and impartial consideration of the defenses petitioners sought to rely upon.

Defense counsel's efforts to deal with the situation were met with running commentaries by the judge in the presence of the jury, despite counsel's pleas that they be heard at sidebar. See, *e.g.,* R. 789, 817, 818, 829, 1881, 1944, 1958. In those colloquies the judge repeatedly expounded for the benefit of the jury the prosecutor's theory that pure hearsay was admissible for the purpose of overcoming Johnson's anticipated entrapment defense. As is evident from the following examples, this was done in such manner as to inevitably implant in the jury's mind the belief that Johnson was in fact "a big pusher" who could not possibly offer a credible claim of entrapment: [3]

1024; 1025–27; 1033–34; 1037; 1039–43; 1061–62; 1064–67; 1076–77; 1084–87; 1125–26; 1129–30; 1132; 1282–83; 1286–87; 1296; 1303–05; 1313–15; 1322–23; 1327; 1340–41; 1345–48; 1351–56; 1371–72; 1422–25; 1569; 1575–76; 1684; 1691; 1715–16; 1717–20; 1722–23; 1728–29; 1737–38; 1744–45; 1749–51; 1755–56; 1757i–57k; 1774–76; 1783–85; 1804; 1811–12; 1833–36; 2003–07; 2029–30; 2038; 2041; 2043–44; 2047–48; 2049; 2050; 2061; 2075–76; 2077–85; 2188–90.

The judge also frequently interjected himself in defense counsels' cross-examination, quite clearly to assist the witness or the prosecutor. Examples appear at the following pages of the record: 1476; 1479–80; 1486–87; 1502–05; 1514–39; 1543–44; 1552–53; 1555–57; 1560–63; 1567; 1576; 1660; 1661; 1693–95; 1700–02; 1855–56; 1858–59; 1862–67; 1912–16; 1917–36; 1938; 1964; 1965; 1966; 1982; 1985–86; 1994–95; 2133; 2146; 2162–63; 2169–70; 2181.

3. Other examples of wholly gratuitous comments by the judge either to assist the prosecutor or contradict defense counsel during Brown's cross-examination are the following:

"THE COURT: Wasn't there something brought out on cross-examination [of Officer Richardson] that there was nothing on any of these transcripts which showed Mr. Johnson saying, 'Go over to that bar'? I think this district attorney is entitled to show, if he can, that perhaps the reason for it was that Mr. Johnson spoke with such a tone of voice it wasn't caught. I don't know what he is going to have in mind, but your [defense counsel's] objection is overruled." R. 1259.

\* \* \* \* \* \*

"THE COURT: The witness [Brown] didn't say Mr. Johnson asked him.

"MR. ALCH: Yes, he did. That was my question. I said, 'Did Mr. Johnson ever invite you over to his house?' He said, 'Yes,' and he began by referring to a conversation between Mr. Johnson and Pete Knight, which is not responsive.

"THE COURT: Did Mr. Johnson personally ask you to come to his house?

"THE WITNESS: No, sir.

"THE COURT: All right." R. 1502.

\* \* \* \* \* \*

"[MR. ALCH]: When he came back at three-fifteen, did he [Johnson] have the $23,000 with him?

"THE COURT: If you know.

"MR. TAUB: At which point, your Honor?

"MR. ALCH: At three-fifteen.

"THE COURT: The testimony was, so the jury can understand what we are talking about, according to Mr. Brown—his credibility is for the jury—that they went into the back of the Cadillac automobile, and then they got a paper bag and they put the paper bag in the rear of the Cadillac automobile—

"MR. ALCH: I am going to except to your Honor's remark.

"THE COURT: —where they took it out again and the witness said he put it in the defendant's automobile that he was driving, and then the defendant went off.

"Later on, the witness says, he saw the defendant again in the Motown Bar.

"Is that the substance of what you testified to, Mr. Brown?

"THE WITNESS: Yes, sir." R. 1565–66.

When defense counsel legitimately sought to cross-examine Brown on differences between his prior testimony of the initial conversation at Johnson's home and the wording of the tape transcript, People's Exh. 2–A in evidence, the court was quick to sustain the prosecutor's groundless objection as follows:

"BY MR. ALCH:

"Q And isn't it a fact that after Mr. Johnson said, 'I'll be in Brooklyn later, about one o'clock,' the next words spoken were by you, in which you said, 'You got a nice place here, man'?

"A Yes, sir.

"Q So that at that point, after Mr. Knight had initially asked Mr. Johnson to meet with him at one o'clock, or whenever it was later on in Brooklyn, Mr. Johnson at that point didn't say, 'What do you want to talk to me about, what do you want to see me about?'

"MR. TAUB: I object to this question.

"THE COURT: Objection sustained.

"MR. ALCH: Exception.

"THE COURT: Mr. Alch, you have a perfect right to question Mr. Brown to your heart's content on the conversation.

"THE COURT: ... When Police Officer Brown testified what they told him, it was not to prove to you [the jury] that he, the defendant, is a big-time dealer, which has nothing to do with the case, it was allowed only *to show the state of mind of the police officers that they weren't trying to trap an innocent person, that they had reason to believe that this man, this defendant, was dealing with narcotics,* and so they were going to continue their investigation to see if it was a fact or not. (R. 799, emphasis supplied.)

\* \* \* \* \* \*

"THE COURT: Ladies and gentlemen of the jury, I again am allowing this conversation in evidence to show the officer's state of mind and the same way that *I allowed the testimony about what Sergeant Martinez and Matera said about what this defendant is supposed to be, a big pusher,* and so forth. I am also allowing this testimony in simply to show the state of mind of these police officers. Were they trying to trap this defendant, *or did they have information of such a character that it would lead reasonably intelligent and prudent police officers to believe that this defendant might be committing a crime, might be predisposed to sell narcotics,* and were, therefore, going to continue the investigation. (R. 807–08, emphasis supplied.)

\* \* \* \* \* \*

"THE COURT: —who told Officer Brown that he, the confidential informant ["Pete" Knight], had worked for the defendant Johnson for ten years. They set up this cover story about what Officer Brown was supposed to be. I have admitted all this solely on the issue of entrapment, the intent, the state of mind, the good faith of the police. Were they simply trying to trap an innocent man who was never predisposed to sell drugs, or were they conducting a bona fide investigation? And you [the prosecutor] want to offer the testimony, as I understand it, as to what Officer Brown

"When you are asking him to characterize a document which is in evidence, that I will

did after he had this talk with the confidential informant, to show that Officer Brown was conducting a bona fide investigation, Officer Brown with his associates, and not merely trying to trap this defendant, is that your point? (R. 836.)

\* \* \* \* \* \*

"THE COURT: Again, we are addressing ourselves to the defense of entrapment that you have offered, Mr. Alch, and *the witness is simply showing what he did, that he was conducting a bona fide investigation. At least, that's the theory of the district attorney.* And the credibility of the witness is for the jury to decide. They will have to decide whether he is telling the truth. (R. 842, emphasis supplied.)

\* \* \* \* \* \*

"If you were to say that you don't have a defense of entrapment, that would be another story, but so long as you raised the issue and you told that to the jury, then *I will allow the district attorney to offer evidence that will show that there is no entrapment.* Whether there is or not is for the jury to decide." (R. 843, emphasis supplied.)

When defense counsel objected to the prosecutor asking Brown if he knew "the defendant would agree to sell you heroin" when Brown and the informant, Knight, rang Johnson's doorbell on February 21, 1973, the objection was overruled with the following comment:

"THE COURT: No, it seems to me that goes to [the] question of entrapment. If the witness knew when he went in there and knew that he was actually going to buy, that this defendant Johnson was going to sell him narcotics, that's one thing, but if he goes in there and doesn't know whether Johnson will sell him narcotics or not, but is simply giving the defendant Johnson an opportunity, if he wanted to do it, to sell him narcotics, then that certainly is not entrapment." (R. 936–37.)

not permit you to do, because that is a matter of argument to the jury, you see." (R. 1524.)

Brown, of course, entered Johnson's home with Knight for no other purpose than to induce conversation about narcotics to be recorded on Brown's concealed tape recorder and later used at Johnson's trial, and his conduct was precisely of the kind which would give rise to the defense of entrapment.

At the trial, the playing of the tape was preceded by the following commentary of the judge:

"THE COURT: . . . The district attorney is asking you to believe that Mr. Brown is telling you the truth and to corroborate his testimony says, 'I have here the actual recording of the conversation that the three of us had,' which is in evidence. And this transcript is a transcript of the recording so that you will be hearing what you will be reading at the same time.

"Therefore, the district attorney is arguing to you, and it is up to you to decide that it is—this is proof, says he, that Mr. Brown is telling the truth. Whether you believe that and whether you believe these recordings or don't believe these recordings, that is for you to decide. But I am showing you why I am letting you do it.

"The ultimate question is, is Mr. Brown telling the truth now, and to show that he is telling you the truth, the district attorney is offering these People's Exhibits 2 and People's Exhibit 2–A as an exhibit, simply as an aid to you in determining the truth. This transcript is given to you so that as you listen to the conversation, you can see whether the transcript is accurate or not, and as an aid to you in listening to the tapes, and seeing what the tapes contain. It is in the same position as the photograph of the house." (R. 953–54.)

Following the playing of the tape, the judge reminded the jury:

"THE COURT: Of course you may recall that I allowed in evidence at the beginning of Mr. Brown's testimony about what Sergeant Martinez and Police Officer Matera told him about the defendant." (R. 957.)

The reference was to the court's prior interrogation of Brown which brought out that the named officers "told me that they had complaints that the defendant seated over there, Jessie Johnson, was a large-scale narcotic dealer in the Brooklyn area." R. 790. When Sergeant Martinez later testified, however, it became clear that the only prior information the police had about Johnson was derived from "Pete" Knight, following the latter's arrest for selling heroin. Based on his "cooperation" the police pursued the "investigation" of Johnson, for which Knight was later rewarded by dismissal of an indictment and other charges against him. R. 1773–76.

The introduction of that evidence prompted a further explanation by the court to the jury regarding the prosecutor's theory:

"THE COURT: . . . The district attorney intends to argue to you—Mr. Alch [defense counsel], of course, will argue to you that Mr. Johnson, if he committed this crime, that is, if he sold the narcotics, was trapped into doing it, and therefore he should be found not guilty.

"The district attorney is going to ask you to draw an inference from the evidence that he was not trapped into it at all. The district attorney is going to argue that Mr. Johnson had this disposition to sell the narcotics, the criminal intent to sell narcotics, and all that the police were doing here was conducting a bona fide investigation into the narcotic activities in the Bedford-Stuyvesant area, allegedly, which may have involved Mr. Johnson.

"To show you, to ask you to draw an inference that the police weren't out to lay a trap for Mr. Johnson, they weren't just out to get him, they were conducting a bona fide investigation of narcotics in the Bedford-Stuyvesant area, and the possible activity of the defendant, Mr. Johnson, and I am allowing that evidence which you may believe or not—that is entirely up to you—solely for the purpose that you may say to yourselves, here the police had information from this fellow,

Pete Knight, the confidential informant, which led them off into this investigation; on the issue as to whether the police were seeking to trap him simply to make this arrest, to trap the defendant, Mr. Johnson, or whether they were simply affording him an opportunity in the conduct of a bona fide, honest investigation that the police were making, which led to Mr. Johnson." (R. 1778–79.)

As is so apparent in the record, "Pete" Knight was a principal actor for the police in the initiation and consummation of the narcotics transaction for which petitioners were convicted. R. 1513. But despite his omnipresence in the prosecution's case, he never appeared at trial. The reason is obvious: by virtue of the judge's unprecedented ruling that the prosecution was entitled to show the "good faith" of the police to counter the defense of entrapment, Knight's "testimony" regarding Johnson's reputation—and hence predisposition—was presented to the jury through the mouths of Officers Brown and Martinez. The admission of such accusatory hearsay and double hearsay was not only prejudicial error as a matter of law but also a clear denial of petitioners' Sixth Amendment right to be confronted by a key witness against them.

*Hall's Claims*

Hall was 25 at the time of trial and separated from her husband. She and her eight-year old daughter lived in Brooklyn with her mother. Hall had no prior criminal record and previously had been employed as a dietician in training at St. Johns Hospital, Brooklyn, and later as assistant manager of a women's clothing shop. The latter employment led to her acquaintance with Johnson, who owned a factory for screen-printing designs on materials for women's clothing. During the year that she knew him she packed boxes at his factory, was supported by him, and lived in his apartment at 950 Rutland Road when not staying at her mother's house.

Hall's sole defense at trial [4] was her own testimony that she did not know the contents of the green knapsack and did not even see it until Johnson told her to give it to "Pete" Knight just before he dropped her off at the Centaur Bar. She further testified that a shoulder strap visible in one of the police photographs showing her walking to Johnson's car on February 23 was part of a shoulder handbag she customarily wore. Following her arrest on March 12, the handbag was seized and remained in police custody until she testified, when it was produced in court and she was permitted to show the jury how she wore it over her shoulder.

Since Hall's defense depended entirely upon the credibility of her denial of knowledge that she was assisting in the consummation of a sale of heroin despite the virtual admissions of her co-defendant, it was of the utmost importance that the jury have the opportunity to hear and consider her testimony free of any influence on the part of the trial judge. But here again the court could not restrain itself. Unable to await the prosecutor's cross-examination, the court, without justification, broke into defense counsel's brief direct examination of his client at the outset. Hall had just testified to "Pete" Knight's arrival at the Centaur Bar accompanied by a "girl" (Officer Richardson), his request to the girl that she take the "bag" (knapsack), the girl's remark that she already had a bag and query, "how am I going to carry two bags?", and Hall's suggestion that she carry both over her shoulder. R. 2227–29. The court thereupon took over Hall's examination:

"THE COURT: Just a minute. This Miss Richardson, as I understand it, had her own bag?

"THE WITNESS: Right.

"THE COURT: Every lady carries a bag.

"THE WITNESS: Yes.

"THE COURT: And when Pete—did you know what Pete's last name is?

4. The court specifically instructed the jury that Hall could not rely on the defense of entrapment pleaded by Johnson; that if they found Johnson not guilty by reason of the claimed entrapment, they could still find Hall guilty of the sale. R. 2623.

"THE WITNESS: Knight.

"THE COURT: Pete Knight, when you were talking about Pete, you meant Pete Knig..t all the time when you mentioned Pete during your testimony?

"THE WITNESS: Yes.

"THE COURT: All right. Did you say Pete said to you, 'Give it to Miss Richardson'?

"THE WITNESS: No, he didn't say to me, 'Give it to Miss Richardson.' He said to her, he said—

"THE COURT: He said to Miss Richardson, take the bag that was lying on the bar?

"THE WITNESS: That was laying on the bar, right.

"THE COURT: She said, 'How am I going to carry it, I've got two bags'?

"THE WITNESS: Right.

"THE COURT: You said, according to your testimony, 'Carry the green bag on your shoulder'?

"THE WITNESS: Right, because she had the small bag, and if she put this little one on, nobody would have been able to see the little bag, anyway.

"MR. PELCYGER: May I respectfully except to your Honor's questioning.

"THE COURT: I simply wanted to know what the witness was saying. We are dealing with two bags.

"MR. PELCYGER: May I respectfully object, if the Court please.

"THE COURT: Next question, please, Mr. Pelcyger.

"MR. PELCYGER: Will your Honor make a ruling?

"THE COURT: You have excepted, you said.

"MR. PELCYGER: I made an objection to your Honor's questioning the witness at that time.

"THE COURT: All right, the objection is overruled.

"MR. PELCYGER: Exception, please.

"Again, I object to your Honor's taking your left hand and sort of waving it in front of the jury when you did that.

"THE COURT: I don't understand you at all, Mr. Pelcyger. Must I sit here like a mummy without moving?

"MR. PELCYGER: But you are breaking me up, Judge. You are interfering in my direction [sic] examination to a point where I can't examine this witness properly. That's the district attorney's duty. He is here for that purpose. He will have his turn.

"THE COURT: Come on, Mr. Pelcyger, please, put your next question."
R. 2229–31.[5]

The court's explanation of the need for its questioning is baffling. Hall's responses to her own counsel's questions were plain and direct; no clarification was required. Unfortunately, the court's interest and emphasis on her words and actions at the Centaur Bar could serve only to engender in the jury's mind the impression that her ambiguous comment that "nobody would have been able to see the little bag, anyway" indicated guilty knowledge of its contents.

The jury's ability to evaluate Hall's credibility without suggestion from the court virtually vanished, moreover, when during the prosecutor's cross-examination, the judge again interjected with the following question:

"THE COURT: Miss Hall, when Mr. Johnson gave you the knapsack and told you to go into the Centaur Bar and give it to Pete Knight, weren't you curious at all about what was in the knapsack?

"THE WITNESS: No.

"THE COURT: Next question, please." (R. 2310.)

The suggestiveness of such a question in the circumstances is obvious. It could only be recognized by the jury as a clear signal of the judge's belief that Hall's disinterest in the contents of the knapsack was unbelievable.

---

**5.** Other examples of the court assisting the prosecutor in conducting cross-examination of Hall are found at the following pages of the record: 2268–69; 2276; 2298–99; 2302; 2310; 2338–41; 2344.

Hall's chances of a fair consideration of her defense faded even further when the judge, reversing a ruling made before she testified, took it upon himself to cross-examine her concerning articles seized when the police searched the Rutland Road apartment at the time of her arrest. Exhibiting the police search inventory, the judge questioned her as follows:

"THE COURT: Miss Hall, I will put this question to you now:

On March 9, 1973, in Apartment 406—

"MR. TAUB: March 12th.

"THE COURT: March 12, 1973, in Apartment 406 of 950 Rutland Road, was there to your knowledge in that apartment so[me] glucose, a scale, a plastic bag with white powder in it, and tinfoil with powder?

"MR. ALCH: Objection and move for a mistrial.

"THE COURT: The objection is overruled.

"Motion is denied.

"MR. ALCH: Exception.

"MR. PELCYGER: The same on behalf of the defendant Hall, if the Court please.

"THE COURT: Motion denied.

"Do you understand the question?

"THE WITNESS: Yes.

"THE COURT: Answer it, please.

"THE WITNESS: Yes.

"THE COURT: Did you know that was there?

"THE WITNESS: Yes. Because the glucose is sugar supplement. You don't have to use sugar, and I use that in my milk.

"THE COURT: Did you have a plastic bag with powder in it?

"THE WITNESS: Flour.

"THE COURT: Flour?

"THE WITNESS: Yes.

"THE COURT: Did you have a scale?

"THE WITNESS: Yes, it was a scale in there. It was there when we first moved in the apartment. I have never used it.

"THE COURT [to the prosecutor]: Now go to something else." (R. 2340–41.)

Not only did the judge's intervention inevitably attach a significance to the articles which could not have failed to influence the jury, but it also emboldened the prosecutor in his summation to repeatedly accuse her of being a partner with Johnson in a "cutting room" operation at the Rutland Road apartment. There was no evidence to support such an accusation.[6] The undisputed facts were that the heroin delivered to Officer Brown contained no glucose as a mixing agent and was packed in hermetically sealed plastic bags, thereby indicating that Johnson had obtained it in that form. R. 1287, 2101. The judge, moreover, had previously rejected the prosecutor's attempt to offer the seized articles as proof of Johnson's "predisposition" to deal in drugs, ruling that they were of such doubtful admissibility under New York law and so "unquestionably prejudicial" as not to be admissible in the circumstances. R. 2119.[7]

6. While broad latitude is permitted in closing arguments, a prosecutor may not "refer to 'facts' that are not in the record, misstate the evidence, or allude to personal knowledge of guilt or innocence that places his own belief on the scale of justice." *United States v. Suarez,* (2 Cir., December 5, 1978), Dkt. No. 78–1319, Slip Op. 533, 536.

7. Indicating his own doubt as to the prosecutor's accusations against Hall, the judge made reference to the argument in his charge:

"The district attorney asks you to draw an inference from all the evidence that she was also either working for Johnson or a partner with Johnson, in maintaining a cutting room at 950 Rutland Road. I don't see how strong that evidence is. I don't see that it is too strong at all. But that is up to you to decide whether that is a fair inference based on the evidence in the case." (R. 2613.)
Any mitigating effect of that instruction, however, had already been overcome by the judge's own erroneous recollection of the evidence in previous portions of the charge. Thus he told the jury:

"You remember, there was a witness who testified about cutting. A man has glucose or quinine and he takes heroin and mixes it up. That is cutting it once. And then after that mixture he takes glucose and quinine and mixes it again. That is cutting it twice. Three and four times." (R. 2577.)
And again:

The jury was unaware of the court's prior ruling since it was made in their absence; and in view of the court's footnoted instructions, it would have been virtually impossible for them not to accept the prosecutor's contention that Hall was not only Johnson's mistress but also his knowing accomplice in crime.

The damaging impressions created by the judge's dominant role in the State's case and the prejudicial hearsay he sanctioned were in no way cured by any instructions in his charge to the jury. On the contrary, as defense counsel noted, the charge contained fulsome summations of the prosecution's "contention" and evidence with but barest reference to petitioners' contentions and testimony, and then in a manner which reflected the judge's low opinion of their character and their defenses. For example, at the outset, after instructing the jury "not to be prejudiced against the defendant Hall because her lawyer said she was living in a meretricious relationship with the defendant Johnson" (R. 2543), the judge emphasized their right to consider such conduct in evaluating her testimony and credibility, adding:

> "Do you regard her admission that she was being kept by the defendant Johnson as an act of moral turpitude? Do decent, normal people carry on that way?" (R. 2549.)

And again, with obvious sarcasm:

> "Did they understand what they were doing? Or was it all a mistake? Did Mr. Johnson have an idea that he was selling talcum powder, or something of that sort?" (R. 2583–84.)

Repeatedly the judge referred to defense contentions only in the context of emphasizing how they were answered by the People's evidence. Thus, in obvious response to Hall's testimony that she did not carry the green knapsack (containing the narcotics)

"The law is realistic; the law is sensible. If a person takes one ounce of pure heroin, how many people can he reach by cutting it up? Maybe two or three. But if he takes that heroin and mixes it with a pound of other substances like glucose or gelatine or any of those other substances, he can cut this

out of the apartment, and her contention that the police photographs did not corroborate their testimony, the judge commented:

> "I looked at the pictures. I couldn't make it out myself. That doesn't mean maybe you can't make it out. You have to decide these things.

> "But the witness Sergeant Martinez and Patrolman Matera didn't say 'I looked at the picture and I recognize Hall.... I recognize the knapsack.'

> "Sergeant Martinez says he was sitting in the automobile about 300 feet away from 950 Rutland Road, and he was using binoculars, and he saw through those binoculars the defendant carrying a green knapsack.

> "Sergeant Martinez says he was sitting in the driver's seat. 'I leaned over and I was taking pictures, and I used a telescopic lens, and I looked through the telescopic lens, and I could see that the defendant Hall was carrying a knapsack.'

> "In effect he says 'I snapped that picture. I can't help it if the picture didn't come out clear....'

> \* \* \* \* \* \*

> "'I am not telling you that from the picture, that is Hall. I am not telling you from the picture that that is a green knapsack. All I am telling you is what I saw with my own eyes.'" (R. 2550–52.)

Defense arguments assailing the character of "Pete" Knight and his non-appearance at trial were answered by the judge with an extensive recital of the State case, viz.,

> "[THE COURT:] What does the district attorney say here? The district attorney says that 'at the beginning of 1972 we arrested a man, Pete Knight, either for selling or having narcotics in his possession; and we made a deal with him that if he gives us information about

up maybe fifty or sixty ways and reach fifty or sixty people, and sell heroin to fifty or sixty people, instead of one." (R. 2585.) There was no such witness and no such testimony. The prosecutor had stated in colloquy that he would produce a police chemist to testify about "cutting" but did not. R. 2364.

other people who are pushing narcotics in the Bedford Stuyvesant area, we—that is, the police—will go easy with him.'

"I think the testimony was that the police officer did not say 'We will dismiss this indictment,' but they said 'We will call the fact that you cooperated with us to the attention of the proper authorities and ask them to take that into consideration.'

"But the indictments were dismissed.

"Now, what happens? The police, as is their obligation under the law, now begin an investigation into whatever it was that Pete Knight told them; and to help them in that investigation they have got to send undercover agents into that area to find out if narcotics are being sold or not.

"So, they call in Officer Brown. Sergeant Martinez was the supervising sergeant. He was in charge of this investigation. He and his associates were the ones who talked to Pete Knight.

"So, they called in Officer Brown, the undercover agent. And later on they called in undercover agent Richardson, to see what could be seen, to see if what Pete Knight was telling them was so, to see if there were other people who were pushing narcotics in Bedford Stuyvesant.

"So, what does Brown do?

"Remember again, I told you it is your recollection which controls, and not mine; and your recollection of the contentions which controls, and not mine.

"What does Brown do? Brown now takes a cover; he assumes an alias. He says 'My name is Grady,' I think it was, 'and I come from Washington where I deal in narcotics. But I don't like the stuff I get when I buy it in Washington, because it is given to me light. They cut it up too many times. It is given to me light, and the quality isn't too good, and I can't get as much in Washington, so here am I in Brooklyn.' A buyer, a big buyer from Washington, ready to buy narcotics.

"So, it is the contention of the district attorney that Brown let it be known around the neighborhood who he was.

"And what is the next thing, what is one of the things that happened?

"September 14, according to Brown, he is sitting in the Motown Bar & Grill at a bar, when the defendant Johnson came over to him and frisks him, patted him down.

"And Johnson says, according to Brown's testimony, I think he said 'I am sorry,' or 'I have the wrong person,' or something of that kind, and walked away.

"And the district attorney is asking you to draw an inference from that that Johnson had found out about this fellow Brown being in the neighborhood, being a big buyer from Washington and is looking for buys; and the district attorney asks you to draw the inference, and it is up to you whether you want to draw it, that now Johnson heard about it and he is going to find out who Brown is.

"Is he a real buyer, or is he carrying a gun? And is he an agent?

"The next time, according to Brown, that he saw the defendant, was when Brown was outside on December 29, outside of the Motown Bar & Grill. He says the defendant came outside and looked in his direction, Brown's direction, and then walked back to the Motown Bar & Grill.

"And the next time that he said he saw the defendant Johnson was when Brown and Pete Knight went to the defendant Johnson's home on Linden Boulevard in Queens, where they had that first conversation of February 21, 1973—which is one of the recordings in evidence.

"And the district attorney argues that Johnson must have known about Brown all the time because according to this exhibit, if you believe the exhibit, when he came in Pete Knight, who allegedly knew Johnson before, didn't introduce Brown. They just began talking. They talked about the furniture in the house, and then, as Mr. Alch properly pointed out, the confidential informant brought up the subject of narcotics.

"I shall talk to you about that later when I discuss the entrapment.

"So, the district attorney said, from that point on there was this understanding that Johnson would sell the narcotics to Brown.

"Now, says the district attorney, the defendant Johnson wasn't in it alone. The district attorney says you have a right to draw an inference from the evidence that the defendant Hall was in with him on the sale, too. He asks you to draw an inference when the defendant Hall says 'I live with my mother and an eight-year-old child in one place, and the defendant Johnson's residence is on Linden Boulevard,' and Miss Hall admits that they were both living together at 950 Rutland Road; the district attorney asks you to draw an inference that that place was used for the purpose of cutting up heroin when it was to be sold.

"The district attorney points out to you that the defendant Johnson in one of his conversations says, in the Motown Bar 'When you get the money I can get up the stuff for you in twenty minutes.'

"The district attorney contends he didn't mean that he was going to Connecticut to get it, he could never get back in twenty minutes to get it; the district attorney argues that he had that stuff— he asks you to draw the inference that the defendant Johnson had that stuff, those narcotics, at 950 Rutland Road; and all he had to do was go get it, cut it, and bring it back.

"You remember, there was a witness who testified about cutting. A man has glucose or quinine and he takes heroin and mixes it up. That is cutting it once. And then after that mixture he takes glucose and quinine and mixes it again. That is cutting it twice. Three and four times.

"Therefore, contends the district attorney, there was a sale consummated. The defendant Johnson sold these narcotics to Mr. Brown; and he was aided in that by the defendant Hall. And he says, even if you don't find that the defendant Hall actually was part of this cutting system or that they were actually cutting it up in 950 Rutland Road, the defendant Hall was at least responsible because she was the courier, she was the messenger; she carried the narcotics.

"I shall talk to you about that in just a moment. I am just outlining to you what I understand are the contentions of the parties.

"And all of this, contends the district attorney, led to the ultimate sale on February 23." (R. 2572–78.)

Argument of Johnson's counsel that it was police instigation which brought about the sale was answered by the judge's reminder of what the prosecutor had said:

"[THE COURT]: The district attorney says that if Johnson didn't want to sell at first, the reason he didn't want to sell, says the district attorney, is because he was suspicious of Brown. He thought Brown might be an agent, says the district attorney, as witness the fact that on September 14, three months before, the defendant was already frisking—if you believe their testimony—already frisking Brown in the bar and grill to see if he had a weapon on him.

"So, the reason, says the district attorney, why Johnson at first demurred and was hesitant about selling was not because he was not disposed to sell heroin, but because he was suspicious of Brown. He had the disposition to sell if he was convinced that Brown was a legitimate buyer, he would have sold him right then and there, argues the district attorney. But the defendant was suspicious because he thought Brown might be an agent. He wasn't going to sell to an agent." (R. 2603–04.)

The partiality so apparent in the court's approving summation of the State case became even more explicit in the added comment to the jury:

"[THE COURT:] I think there might be a vastly different type of case if all you had here was the testimony of the police officer, without these conversations and without these photographs." (R. 2606.)

Although the judge, after hearing counsel's exceptions to the charge, sought to

cure that unfortunate expression of his personal opinion of the strength of the prosecution's case, see R. 2680, the admonition given could hardly have overcome the coercive effect of the judge's domination of the trial, which so clearly telegraphed to the jury the court's belief in petitioners' guilt.

Only recently, the Appellate Division, First Department, reversed a homicide conviction because "the trial justice unduly injected himself into the proceeding to such an extent as to deny defendant a fair and impartial trial." *People v. Ellis,* 62 A.D.2d 469, 404 N.Y.S.2d 862 (App.Div. 1st Dept. 1978). The Appellate Division severely criticized the trial court's "excessive questioning and examination of witnesses, including the defendant who testified in his own behalf, not only with respect to the merits of the case but also respecting their credibility" as incompatible with "the aura of impartiality which should surround every judicial proceeding." *Id.*

After careful review of the State trial record here, the court is compelled to conclude that the conduct of the trial judge not only destroyed "the aura of impartiality" but also the very substance of a fair trial and that petitioners were denied their constitutional rights to due process, to compulsory process, and to be confronted by a witness against them.

The standard of procedural fairness required by the Fourteenth Amendment, and applicable here, was succinctly enunciated by the Supreme Court as follows: "A fair trial in a fair tribunal is a basic requirement of due process." *In Re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). Indispensable to a fair trial is the presence of an impartial judge, by which is meant a judge who recognizes and

discharges his duty to exercise discretion and great care in his conduct, comments and intimations, so as not to influence the jury's consideration of the evidence according to differing views he might entertain. "The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.'" *Quercia v. United States,* 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). Regrettably, however unintentionally,[8] the trial judge here so far exceeded his permissible role of "governor of the trial for the purpose of assuring its proper conduct," *Quercia, supra* at 469, 53 S.Ct. at 698, as to preclude any fair and dispassionate consideration of the evidence by the jury. In sum, "the judge put his own experience [as a former prosecutor], with all the weight that could be attached to it, in the scale against the accused," *id.* at 471, 53 S.Ct. at 699, thereby denying petitioners a fundamental element of due process.

As the record clearly reveals, the judge did so by, among other things, monopolizing the examination of prosecution witnesses on material matters; by examining and cross-examining the only defendant who testified; by suggesting in his charge that "decent people" would not live together as petitioners did, thereby indicating his adverse opinion of their moral character and credibility; by voicing his opinion of the strength of the prosecution's case; by emphasizing and re-emphasizing throughout the trial on the basis of rank hearsay that petitioner Johnson was reputedly a "big pusher" of narcotics in Brooklyn; by adopting without supporting evidence the prosecutor's contention that the apartment at 950 Rutland Road was a drug "cutting

---

**8.** It must be noted, however, that the Appellate Division, Second Department, reversed a narcotics conviction and ordered a new trial because the judge who presided here "unduly interjected itself into the proceedings and undertook to gratuitously aid the prosecution's case by its own interrogation of the prosecution's witnesses and by comments," thereby depriving the defendant of a fair and impartial trial. *People v. Sostre,* 37 A.D.2d 574, 322 N.Y.S.2d 345, 346 (1971).

See also *People v. Baker,* 44 A.D.2d 83, 353 N.Y.S.2d 505 (2d Dept.1974), where a new trial was again ordered on reversal of a drug conviction because the same judge's comments to the jury during trial deprived the defendant of a fair trial, since they "could only have led the jury to believe that the court was in accord with the prosecution's view of the defendant's guilt." *Id.* 353 N.Y.S.2d at 506.

room" in which petitioners were partners, and adding weight to that unsupported claim by reminding the jury of "testimony" regarding "cutting" drugs when there was no such testimony; by instructing the jury in a manner that virtually repeated the summation of the prosecutor; and by incorrectly instructing the jury that the prosecutor had no duty to produce the informant "Pete" Knight.

Regarding the last point, petitioners had moved prior to trial to require the District Attorney to make available to them for interrogation, pursuant to their right of confrontation, "any secreted witnesses or alleged 'informants' sufficiently in advance of trial" to enable them to properly prepare their defense. R. 44a, 51a. Their effort was unavailing, since the district attorney opposed and the court denied petitioners' motions, R. 71a.[9] While it appears from Hall's testimony that Johnson and she had been previously acquainted with Knight, R. 2223, 2227, it seems abundantly clear from the record that without the compulsory process of the court, he was not available as a witness for petitioners.[10]

In the circumstances of this case, the prosecution's refusal to produce Knight, while resorting to inadmissible hearsay to get his testimony before the jury, not only violated fundamental requirements of fairness but also petitioners' right of confrontation. Officer Brown's own testimony and the secretly recorded tape transcript, on which his account of events in Johnson's home was obviously based, clearly reflect Knight's persistent efforts to overcome Johnson's initial reluctance and induce him

to provide the narcotics that Brown, posing as "Grady," desired. Knight's testimony was clearly of the utmost relevance and materiality to Johnson's defense of entrapment; and might possibly have corroborated Hall's defense that she was an unknowing participant in the crime.

Knight's role was more than that of a mere informant. Like the "John Doe" in *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), he was an agent of the police "who helped to set up the commission of the crime and who was present at its occurrence." *Id.* at 61, 77 S.Ct. at 628. He was thus "a person acting in cooperation with a public servant, seeking to obtain evidence against [Johnson] for purpose of criminal prosecution," as defined in N.Y.Penal Law § 40.05, *supra,* which provides for a defense of entrapment in such situations. But as the judge charged the jury, under N.Y.Penal Law § 25, Johnson had the burden of proving that defense by a preponderance of the evidence (R. 2607–12)—a far heavier burden than rested upon the defendant in *Roviaro, supra* at 63, 77 S.Ct. at 629. Indeed, in that case the Supreme Court specifically recognized that because the informant had played "a prominent part" in the crime, "[h]is testimony might have disclosed an entrapment." *Id.* at 64, 77 S.Ct. at 629. As in *Roviaro, supra,* the refusal of the prosecution to make Knight available at trial denied petitioners a fundamentally fair trial and thus deprived them of due process.

Aside from the judge's prejudicial conduct and the State's opposition to producing

---

**9.** The New York Court of Appeals, citing *Roviaro, infra,* has recognized the right to have a witness such as Knight made available to the defense. In *People v. Goggins,* 34 N.Y.2d 163, 356 N.Y.S.2d 571, 313 N.E.2d 41 (1974), that Court observed:

"Limiting the adversary stance in criminal prosecutions, the State is obliged to disclose to a defendant evidence and potential witnesses possessed by or known to the prosecution which may establish his innocence. That such evidence or knowledge may involve prosecutorial privileges of one sort or another is to no avail. The privileges must yield to the overriding consideration of avoid-

ing the risk of convicting the innocent, unless, of course, the prosecution should elect to abandon its case rather than allow disclosure." 356 N.Y.S.2d at 575, 313 N.E.2d at 45; citations omitted.

**10.** Although the prosecutor disclaimed knowledge of Knight's whereabouts, his police witness, Martinez, acknowledged hearing of Knight "during the last trial"—obviously of other defendants—at which point the judge quickly called a sidebar conference, not reported except for his statement that "no further questions should be asked concerning this matter." R. 1833.

Knight, petitioners' situation at trial was further prejudiced by the prosecution's use of hearsay testimony of statements by Knight, pp. 866, 867, *supra,* which conveyed to the jury that Johnson was a heavy dealer in narcotics without further proof. The trial judge admitted such testimony on the alleged issues of the "state of mind" of the police and the "good faith" of their investigation, which were said to have been raised by the defense of entrapment. The ruling was without precedent and prejudicially erroneous despite the judge's repetitious limiting instructions, which served only to enhance the probative effect such evidence would have upon the jury.

First, the defense of entrapment does not focus upon the "state of mind" or "good faith" of law enforcement officers or those acting as their agents. Entrapment involves only two considerations: whether there was inducement on the part of the police, and if so, whether the defendant showed any predisposition to commit the crime. See *United States v. Sherman,* 200 F.2d 880, 882 (2 Cir.1952). Only two evidentiary aspects are examined in order to determine whether the defense exists: (1) the objective conduct of the law enforcement officers, and (2) the predisposition of the defendant. See *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 1819, 2 L.Ed.2d 848 (1958). Indeed, it is only when police action implants the criminal design in the mind of the defendant that the defense of entrapment comes into play. See *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Thus there was no occasion for admitting hearsay as to Johnson's alleged reputation in the community on the theory that it showed the "good faith" of the police in investigating Johnson.

Second, the admission of such hearsay in the circumstances here denied petitioners their right to confront a witness against them. That Brown and Martinez testified and were subject to cross-examination is not a substitute for the witness, Knight, who, it was claimed, had worked for Johnson and received heroin from him. R. 2003. The hearsay statements were of the most

damaging character and clearly had the effect of undercutting Johnson's entrapment defense based upon the manner in which the police with the aid of Knight came to his home and initiated the conversations which led to the offense. The very procedure was condemned only recently in *United States v. Check,* 582 F.2d 668 (2 Cir. 1978), as plain error which substantially affected a defendant's rights.

In *Check, supra,* a police officer was convicted of dealing in narcotics. The evidence against him consisted primarily of testimony of a fellow police officer who had acted in an undercover capacity. That testimony incorporated hearsay statements of an informant, who had served as a go-between but did not appear at trial. The prosecutor sought to defend their admissibility because the hearsay statements were not being offered for the truth of the matters asserted and the undercover officer was available for cross-examination. The Court, in reversing the conviction, demolished that contention, declaring that the conversations with the informant

> "were indeed hearsay, for that testimony was a transparent attempt to incorporate into the officer's testimony information supplied by the informant who did not testify at trial. Such a device is improper and cannot miraculously transform inadmissible hearsay into admissible evidence." 582 F.2d at 679.

The Court further noted that the prosecution not only received the benefit of having an additional witness "while simultaneously insulating [him] from cross-examination," but also that the procedure had the additional effect of conditioning

> "the jurors in advance of their hearing any *admissible* testimony to believe [the defendant] to be a genuinely reprehensible character." 582 F.2d at 684, emphasis by the court.

These were precisely the effects of the court's ruling in this case, in which he agreed with the prosecutor that the hearsay was "just as legal and proper as if Knight testified." R. 1930. That ruling was clearly erroneous and substantially prejudicial

when the court had denied petitioners the opportunity to compel Knight's production in court.

In view of the court's conclusion that petitioners' conviction cannot stand, it is unnecessary to consider Johnson's further claim that the New York entrapment defense placed an unconstitutional burden of proof upon him. As petitioner concedes, the New York Court of Appeals has upheld the statutory scheme pursuant to which entrapment is made available as a defense. *People v. Laietta,* 30 N.Y.2d 68, 330 N.Y. S.2d 351, 281 N.E.2d 157 (1972), *cert. denied,* 407 U.S. 923, 92 S.Ct. 2471, 32 L.Ed.2d 809. It should also be noted that the Supreme Court has heretofore found no conflict between the Due Process Clause and New York's requirement that the defendant bear the burden of proving an affirmative defense which involves no element of the crime charged. *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). In any event, the arguments advanced here should be addressed to the State courts if there are further proceedings. If there are none, then the question becomes moot.

The conviction of petitioners having been obtained in violation of their right to due process, their petitions are granted and they shall be released from custody unless the State grants them new and separate trials within sixty (60) days.[11]

SO ORDERED.

Dated: Brooklyn, New York
February 5, 1979

### APPENDIX B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x
JESSE JOHNSON and CYNTHIA HALL, :

               Petitioners, :

        –against– :

PAUL METZ, Warden, Great Meadows
Correctional Facility; JANICE WARNE, :
Correctional Superintendent, Bedford
Hills Correctional Facility, :

             Respondents. :
- - - - - - - - - - - - - - - - -x

76 C 442

### MEMORANDUM AND ORDER

NEAHER, District Judge.

Petitioners Cynthia Hall and Jesse Johnson are State prisoners currently serving lengthy sentences imposed following their 1973 conviction, after trial, in New York State Supreme Court, Kings County, for criminal possession and sale of heroin. After an unsuccessful appeal to the Appellate Division, Second Department, denial of leave to appeal to the New York Court of Appeals, and denial by the United States Supreme Court of their petition for certiorari, Hall and Johnson applied to this court for habeas relief. By unpublished memorandum of decision and order entered February 5, 1979, their petition was granted on the ground that the prejudicial conduct and rulings of the judge who presided over their joint trial rendered the proceedings so unfair as to deprive them of due process. A judgment in accordance with that order was entered on February 9, 1979, directing, *inter alia,* that petitioners be released from custody unless granted new and separate trials by the State within sixty days.

On February 28, 1979, respondents filed a timely notice of appeal from the February 5

---

**11.** In the event the State proceeds to retry petitioners, a fair trial of petitioner Hall would require that she not be tried jointly with petitioner Johnson in view of their conflicting positions at trial. Petitioners had opposed consolidation from the outset, R. 67a–68a, and hence there has been no waiver. The Appellate Division, Second Department, following the trial of petitioners, recognized that the defense of entrapment, involving as it does the claiming defendant's admissions (as was the case here with Johnson, see p. 862, *supra*), places his single co-defendant in such an untenable position as to dictate a severance. See *People v. Papa,* 47 A.D.2d 902, 366 N.Y.S.2d 205, 206 (2d Dept.1975). Indeed, it has been held that the non-claiming co-defendant's inability to examine the defendant who asserts entrapment but does not testify is violative of the right of confrontation under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *United States v. Sanchez,* 532 F.2d 155 (9 Cir.1976).

order. On that same date, respondents also presented for filing an application for leave to reargue, contending that petitioners had not exhausted available State court remedies as required by 28 U.S.C. § 2254(b). In an accompanying memorandum of law, they direct the court's attention to two relatively recent and, they claim, controlling decisions of the Second Circuit, *Wilson v. Fogg,* 571 F.2d 91 (2 Cir.1978), and *Fielding v. LeFevre,* 548 F.2d 1102 (2 Cir.1977).

Two rather formidable obstacles stand in the way of respondents' request. First, their motion is, as they concede, untimely. Although respondents have invoked Rule 9(m) of the General Rules of this Court, a motion for reargument or rehearing following entry of a final order and judgment granting habeas relief is properly governed by Rules 52(b), 59(a), and 59(e) of the Federal Rules of Civil Procedure. *Browder v. Director, Department of Corrections,* 434 U.S. 257, 98 S.Ct. 556, 54 L.Ed.2d 521 *passim* (1978). As the Supreme Court held in *Browder,* the non-extendable, see Rule 6(b), F.R.Civ.P., ten-day time limit prescribed for each of these rules is both "mandatory and jurisdictional," 98 S.Ct. at 565; hence, respondents' motion was made and served after the court had lost jurisdiction to reconsider the determinations embodied in the original memorandum and order, *id.* 98 S.Ct. at 560 n. 7. And local Rule 9(m) cannot, of course, be read to permit a contrary result. See Rule 83, F.R.Civ.P.

Second, by filing a notice of appeal from the original order, respondents have effectively deprived the court of whatever power it may have had to grant the relief they now seek, for jurisdiction over all matters decided by that order has been transferred to the Court of Appeals. *Weiss v. Hunna,* 312 F.2d 711, 713 (2 Cir.), *cert. denied,* 374 U.S. 853, 83 S.Ct. 1920, 10 L.Ed.2d 1073 (1964); *Ryan v. United States Lines,* 303 F.2d 430, 433 (2 Cir.1962); *Ying Shiue Jyu Fen v. Sanko Kisen (USA) Corp.,* 441 F.Supp. 45, 46 (S.D.N.Y.1977); 7 Moore's Fed. Prac. ¶ 60.30[2] (1971); 9 Moore's Fed. Prac. ¶ 203.11 (1975).

Despite the awkward posture of this action, the court is not entirely foreclosed from commenting upon the arguments respondents now wish to press. Although the court no longer has the power to re-open the record or to amend or modify the judgment, respondents might still make a timely motion for relief from judgment under Rule 60(b), F.R.Civ.P.—based on petitioners' asserted failure to exhaust State court remedies—either by withdrawing their appeal or by obtaining permission or a remand of the action from the Court of Appeals. See *Weiss v. Hunna, supra,* 312 F.2d at 313; *Ryan v. United States Lines, supra,* 303 F.2d at 434; 7 Moore's Fed. Prac. ¶ 60.30[2], at 419–22 (1971); *cf. Browder v. Director, supra,* 98 S.Ct. at 565 (concurring opinion). The only jurisdictional bar to the exercise of the court's discretion under Rule 60(b), therefore, is the pendency of the appeal, and in such cases the better practice—dictated by interests of judicial economy and efficiency—permits the district court to indicate whether it would grant the relief sought if it had the jurisdiction to do so. See *Ryan v. United States Lines, supra,* 303 F.2d at 434 (adopting the rule of *Smith v. Pollen,* 194 F.2d 349 (D.C.Cir.1952)); *Ying Shiue Jyu Fen v. Sanko Kisen (USA) Corp., supra,* 441 F.Supp. at 46; *Johnson v. Knapp,* 74 F.R.D. 505 (S.D.N.Y.1976); *Freedman v. Overseas Scientific Corp.,* 150 F.Supp. 394, 397 (S.D.N.Y.1956, 1957); *cf. Diapulse Corp. of America v. Curtis Publishing Co.,* 374 F.2d 442, 447 (2 Cir.1967); *Hospital Ass'n of New York v. Toia,* 73 F.R.D. 565, 568 & n. 2 (S.D.N.Y.1976, 1977). See generally *Crateo, Inc. v. Intermark, Inc.,* 536 F.2d 862, 869 (9 Cir.1976). Mindful that the role of the court at this time is solely to offer "guidance" to respondents, compare *Weiss v. Hunna, supra,* 312 F.2d at 713, with *Sampson v. Ampex Corp.,* 335 F.Supp. 242, 246 note (S.D.N.Y.1971) (dictum), *aff'd,* 463 F.2d 1042 (2 Cir.1972), the court notes only that if it had jurisdiction to grant the motion, it would not do so, for the reasons which follow.

Respondents correctly argue that under *Wilson v. Fogg, supra,* a federal habeas court is precluded from considering consti-

tutional claims which have not first been "explicitly" and "squarely" presented to the State courts in a manner calculated "fairly to focus" their attention. 571 F.2d at 94. Unquestionably the exhaustion requirement is "a judicially crafted instrument which reflects a careful balance between important interests of federalism and the need to preserve the writ of habeas corpus as a 'swift and imperative remedy in all cases of illegal restraint or confinement,'" *Braden v. 30th Judicial Circuit Court,* 410 U.S. 484, 490, 93 S.Ct. 1123, 1127, 35 L.Ed.2d 443 (1973) (quoting from *Secretary of State for Home Affairs v. O'Brien,* [1923] A.C. 603, 609 (H.L.)). The rule evolved long before the enactment of 28 U.S.C. § 2254(b) and (c), see *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), and its strict application is hardly novel, particularly where, as here, "the conduct of a state judge is sharply and directly called into question," *Fielding v. LeFevre, supra,* 548 F.2d at 1106. See *United States ex rel. Nelson v. Zelker,* 465 F.2d 1121, 1124–25 (2 Cir.1972). See generally *Allen v. County Court,* 568 F.2d 998, 1101–03, and cases cited n. 10 (2 Cir.1977). Because "[t]he state courts must be afforded an opportunity to set their own Constitutional houses in order before the power of the federal courts is invoked," *Wilson v. Fogg, supra,* 571 F.2d at 93, this requirement is not satisfied merely by presenting to the State courts the factual predicate for a subsequent constitutional claim, *Picard v. Connor, supra,* 404 U.S. at 277, 92 S.Ct. at 513, or by urging in the State courts a constitutional claim different from the claim asserted as a basis for federal habeas relief, *Wilson v. Fogg, supra,* 571 F.2d at 94. Hence, while a federal claim can be raised in the State courts without "citing 'book and verse on the federal constitution,' . . . the substance of a federal habeas corpus claim must first be presented to the state courts." *Picard v. Connor, supra,* 404 U.S. at 278, 92 S.Ct. at 513 (quoting from *Daugharty v. Gladden,* 257 F.2d 750, 758 (9 Cir.1958)); in other words,

> "The constitutional contention made in the federal proceeding need not be identi-

cal with the one advanced to the state court, but it must be its 'substantial equivalent.'"

*Fielding v. LeFevre, supra,* 548 F.2d at 1107.

Petitioners have, however, plainly complied with the exhaustion requirement. Although they advanced four constitutional grounds in support of their petition, only one—their claim that the State trial judge conducted their trial in a manner inconsistent with their due process right to a fair trial—forms the basis for the order conditionally granting the writ. Concededly, authority in this circuit permits a district court under certain circumstances to dismiss a habeas petition *in toto,* but without prejudice, if unexhausted claims have been joined with exhausted claims, see, *e.g., United States ex rel. Martin v. McMann,* 348 F.2d 896 (2 Cir.1965) (*en banc*), in order to reconcile the courts' need to discourage "piecemeal litigation" with the applicant's interest "in obtaining prompt federal consideration of exhausted claims," *United States ex rel. Levy v. McMann,* 394 F.2d 402, 404–05 (2 Cir.1968) (citing *United States ex rel. Boyance v. Myers,* 372 F.2d 111, 112 (3 Cir.1967). Yet where, as here, an exhausted claim is meritorious and is alone sufficient to require that relief be granted, common sense and the historic function of the writ as a means of expeditiously remedying unlawful confinements would be ill served by an order withholding the federal remedy until merely cumulative claims have been passed upon by the State courts. See *United States ex rel. Boyance v. Myers,* 372 F.2d 111 (3 Cir.1967). See generally *Cameron v. Fastoff,* 543 F.2d 971, 976 (2 Cir.1976); *Bergman v. Lefkowitz,* 569 F.2d 705, 713 n. 14 (2 Cir.1977); *McMann, supra,* 394 F.2d at 404 n. 6 (district court's discretion to control successive petitions should be exercised *after* a successive petition has been filed). Accordingly, it is unnecessary to determine whether petitioners' subsidiary claims have been exhausted, since their principal claim was unmistakably presented to the New York courts.

Because petitioners' convictions were affirmed without opinion, our inquiry necessarily focuses upon the issues raised in their State court briefs. See *Smith v. Digmon,* 434 U.S. 332, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978). Johnson's first point on appeal, as its heading indicates, addressed the trial judge's alleged "usurpation of the prosecutor's function." Some 94 specific instances of "error" were asserted, and it was noted that "[t]he presentation of subsequent issues, although different in principle, shall, almost inevitably, evolve [sic] around the conduct of the Trial Judge." Johnson App. Div. Brief at 51. Both State and federal decisions were cited by Johnson in support of his contention that he was thus denied a fair trial. Anticipating the prosecution's argument that evidence of guilt was overwhelming, he urged that:

> "The fundamentals of a fair trial must be respected by an appellate court even though there is proof in the record to persuade an appellate court of Defendant's guilt. *People v. Mleczko,* 81 N.E.2d 65, 298 N.Y. 153 (1948). A fair trial is one of the most basic and fundamental essentials of judicial process *and no matter how strong the evidence pointing to guilt,* a judgment of conviction must be reversed if the trial was not fair. *People v. Dovico,* 179 N.Y.S.2d [3]79, 6 A.D.2d 457 (1958). However strong the evidence against a defendant may be, a conviction should be reversed if the trial was not a fair one, for a fair trial is a fundamental requirement in criminal prosecutions. *People v. Herman,* 7 N.Y.S.2d 560, 255 App.Div. 314 (1938); *People v. DeMartino,* 299 N.Y.S. 781, 252 App.Div. 476 (1937).
>
> \*    \*    \*    \*    \*    \*
>
> "The Defendant claims that the Trial Judge improperly injected himself into the ·trial in such manner and to such extent as to deny the Appellant a fair trial." Johnson App. Div. Brief at 50–51 (emphasis in original).

The substance of this argument was reiterated in the concluding section of Johnson's brief, the heading of which refers expressly to a constitutionally based fair-trial right. See *id., "Table of Contents,"* and at 72.

Hall pressed a substantially identical argument, albeit more concisely, urging that:

> "[T]he entire tenor of the trial was of such a nature as to deprive Appellant of a fair trial, especially in a case as close as this one, so far as the evidence against [her] is concerned.
>
> "The undue participation of the Trial Court in its questioning of witnesses, its repetition of testimony damaging against the Defendants, its statements to the Jury, and its prejudicial remarks throughout the course of the trial deprived the Appellant [Hall] of the fair and impartial trial to which she was entitled." Hall's App.Div. Brief at 37.

Specific instances of conduct were cited and, as did her codefendant, Hall made clear that the more specific errors raised elsewhere in brief were relevant to her fair trial claim. *Id.* at 43.

If petitioners' fair trial claim derived solely from allegations that isolated rulings of the trial judge ran afoul of specific constitutional guarantees or safeguards, this court would be reluctant to find proper exhaustion in the absence of a showing that the precise constitutional issues had been raised, very nearly *in haec verba,* in the State courts. See, *e.g., Wilson v. Fogg, supra,* 571 F.2d at 94. Their claim, however, turns not on discrete allegations of error, but on the broader contention that their entire trial was conducted in a manner not only inconsistent with, but antagonistic to, their due process right to "a fair trial in a fair tribunal." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). The essence of this claim was succinctly stated by the Supreme Court in *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941): "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice."· Unless the exhaustion requirement is to be administered in a manner reminiscent of the petty formalism associated with purely technical rules of com-

mon law pleading—a result plainly inconsistent with the careful rule announced by the Supreme Court in *Picard v. Connor, supra,* 404 U.S. at 277–78, 92 S.Ct. at 513—the court could not reasonably conclude that petitioners were obliged to do more to apprise the New York courts of the substance of their federal claim. *Cf. United States ex rel. Kling v. LaVallee,* 306 F.2d 199, 206 (2 Cir.1962) (Friendly, J., concurring). Moreover, in the unlikely event that petitioners' constitutional claim escaped notice in the New York courts because of their failure specifically to refer to "due process" or the fourteenth amendment in their briefs, little would be served by requiring petitioners to return to the State courts to renew in only slightly altered form a claim that in any event depends in large measure upon wholesale departures from settled New York rules of criminal procedure, evidence and trial management, see *Maggitt v. Wyrick,* 533 F.2d 383 (8 Cir.), *cert. denied,* 429 U.S. 898, 97 S.Ct. 264, 50 L.Ed.2d 183 (1976), and which did not even elicit a written opinion from the Appellate Division when presented on direct review. *Cf. United States ex rel. Gibbs v. Zelker,* 496 F.2d 991, 994 (2 Cir.1974); *Victory v. Bombard,* 432 F.Supp. 1240, 1251 (S.D.N.Y. 1977), *rev'd on other grounds,* 570 F.2d 66 (2 Cir.1978).

*Applications for Stay Pending Appeal and Release "on Bail"*

Respondents have requested, in the alternative to their application for reconsideration, that the court stay execution of the writ pending appeal, and petitioner Hall has asked the court to entertain an application on her behalf for "bail" pending retrial. These requests are independent and will be treated in turn.

It is axiomatic "that a district court has the power to grant a stay of its own order pending the determination of an appeal therefrom." *Ivor B. Clark Co. v. Hogan,* 296 F.Supp. 407, 409 (S.D.N.Y.1969). Where, as here, an appellant is not entitled to a stay upon the filing of a supersedeas bond, see 9 Moore's Fed. Prac. ¶ 223.04 at 3506 & n. 6 (2d ed. 1973), grant or denial of a stay application lies within the discretion of the court, which will consider such factors as "1) the likelihood of success on the merits; 2) whether the movant will suffer irreparable injury if a stay is not granted; 3) whether other parties will be substantially harmed if a stay is granted; and 4) the dictates of the public interest." *Perez v. Wainwright,* 440 F.Supp. 1037, 1042 (S.D. Fla.1977).

Because Johnson is now serving a concurrent federal sentence (his conviction was recently affirmed by the Second Circuit, see *United States v. Lyles,* Nos. 78–1184, 78–1185, 78–1186, 78–1193 (2 Cir., January 31, 1979)), and, as explained below, the court is of opinion that Hall should be enlarged pending appeal, the net effect of the stay respondents now seek would be to preserve the State's right to retry petitioners should the order granting the writ withstand review. Thus, it does not appear that petitioners will be prejudiced by a stay (no claim is made that a delay in retrial would impair their ability to mount an effective defense), while the alternative—in effect forcing the State to elect between pursuing its appellate remedy alone or retrying petitioners within the time allowed by the order and thereby mooting any appeal—will not materially advance any legally cognizable interest of the petitioners and might well disserve the public's interest in the effective administration of the criminal laws. Finally, it cannot be said that the appeal is without merit, since the issues raised in the petition have never been squarely addressed by the Court of Appeals. On balance, therefore, a stay of so much of this court's order of February 5, 1979, as directed that the writ would issue unless petitioners were granted new and separate trials within sixty days is appropriate and will be granted.

Although enlargement of a successful habeas petitioner pending review is no longer mandatory, Rule 23(c), F.R.A.P., vests in the district courts the power to order such release upon the petitioner's recognizance, with or without surety, and "there is still a very strong presumption that a petitioner holding a final judgment that his detention

is unlawful should not be left in state custody." *United States ex rel. Thomas v. State of New Jersey,* 472 F.2d 735, 743 (3 Cir. 1973). The power of the court is not diminished where, as here, the writ is conditionally granted, see *id.* at n. 7, nor superseded by the noticing of an appeal or entry of an order staying the judgment, see *Jago v. United States District Court,* 570 F.2d 618 (6 Cir.1978). Respondents have offered no reason why enlargement should not be ordered and conceded, at oral argument, that the State has not yet decided whether to retry Hall should the order granting the writ be affirmed. Inasmuch as the court has concluded that Hall is entitled to habeas relief and in view of the delay occasioned by the appeal (respondents candidly advise that they have already asked the Court of Appeals to extend certain briefing deadlines), this would appear to be an appropriate case for enlargement under Rule 23(c). See also *Shepard v. Taylor,* 433 F.Supp. 984, 987 (S.D.N.Y.), *aff'd,* 573 F.2d 1295 (2 Cir. 1977) (mem.). Compare *United States ex rel. Rice v. Vincent,* 486 F.2d 215 (2 Cir. 1973). Therefore, a hearing will promptly be held to determine the terms of the recognizance and the surety, if any, required to assure Hall's availability for retrial and compliance with any order or judgment of the Court of Appeals.

Respondents' application for reargument is, accordingly, denied, and execution of the conditional writ is stayed, as above indicated.

SO ORDERED.

Dated: Brooklyn, New York
March 28, 1979

### APPENDIX C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

JESSE JOHNSON and CYNTHIA HALL,　　　:

　　　　　　　　Petitioners,　　:

　　　–against–　　　　　　　　:

CHARLES J. SCULLY, Warden, Greenhaven Correctional Facility, PHYLLIS DURRLY,　:
Correctional Superintendent, Bedford Hills Correctional Facility,

**881**

　　　　　　　　Respondents.

- - - - - - - - - - - - - - - - x

81 CV 1863

### MEMORANDUM ORDER

NEAHER, District Judge.

Petitioners Jesse Johnson and Cynthia Hall have renewed their joint application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. By a memorandum of decision and order dated February 5, 1979, this Court ordered that petitioners be released from custody unless they were granted a new trial, having concluded that the excessive and prejudicial intervention of the trial judge had denied the petitioners a fair trial, in violation of the due process clause of the Fourteenth Amendment. The Court of Appeals reversed that decision and ordered the petition dismissed without prejudice, holding that the petitioners had failed to exhaust their State remedies by not having presented this claim in federal constitutional terms to the State courts. *Johnson v. Metz,* 609 F.2d 1052 (2d Cir.1979).

Petitioners have now exhausted their federal claim by raising it in their motion to vacate their State judgments of conviction pursuant to CPL § 440.10 (McKinney's). Review on the merits (as to which the Court would rule the same as before) is again precluded, however, this time by case law developments since 1979.

Justice Lombardo, to whom petitioners' joint § 440.10 motion in New York Supreme Court was referred, denied the requested relief on procedural grounds only, ruling that because petitioners did not raise the federal issue as such on their State appeal, although the State law counterpart was raised, the terms of § 440 precluded review on the merits. Specifically, CPL § 440.10(2)(c) provides that

"the court must deny a motion to vacate a judgment when

\*　　\*　　\*　　\*　　\*　　\*

"although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of

the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's ... unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him."

The Appellate Division denied petitioners leave to appeal from Justice Lombardo's ruling. App.Div., —— N.Y.S.2d —— (2d Dep't, March 25, 1981).

In previously ordering dismissal of the petition on exhaustion grounds, the United States Court of Appeals anticipated application of CPL § 440.10(2)(c) by the State courts, but evidently sought to blunt its force by the following:

"It is difficult for this panel to believe, however, that no post-conviction remedy whatever will be available by way of state collateral relief when a serious federal constitutional issue is involved.

\* \* \* \* \* \*

"We trust that upon a post-conviction hearing careful attention will be given to this record by the state courts in terms of the serious allegation of constitutional deprivation of the right to fair trial." 609 F.2d at 1056 (footnote omitted).

Clearly, those remarks were premised on the belief that the serious federal claims presented in this petition would not be placed wholly beyond the possibility of remedy either in federal or State court. Nevertheless, the State court decisions on the § 440 motion have now removed that possibility, while the United States Court of Appeals' own decisions have severely undermined the prospect that federal claims can ever be vindicated where counsel have not strictly adhered to a federal labeling requirement on appeal.

The labeling requirement of *Johnson v. Metz, supra,* was reaffirmed only recently in the strikingly similar case of *Daye v. Attorney General of the State of New York,* 663 F.2d 1155 (2d Cir.1981). And previously, in *Forman v. Smith,* 633 F.2d 634 (2d Cir.1980), the court ruled that specific claims not raised on a State appeal may be forfeited by operation of State procedural rules (in that case, as in this CPL § 440.10(2)(c)), and therefore be rendered unavailable for federal habeas review unless "cause" for the failure and resulting prejudice are shown, in line with *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). See *Klein v. Harris,* 667 F.2d 274 (2d Cir.1981). These decisions, and one other, control the outcome here, however unanticipated it was in 1979.

Under *Forman v. Smith* and *Klein v. Harris, supra,* given the State's explicit reliance on the procedural default to preclude review, the issue is whether petitioners have shown sufficient cause to excuse their procedural default. In this proceeding no reason has been advanced to explain the appellate failure. The only explanation apparent from the record is the argument counsel unsuccessfully raised before the State court under § 440.10(2)(c), namely, that the omission of the federal claim as such on the appeal was "justifiable" because the petitioners "in good conscience" had attempted to raise the issue in federal as well as State terms, since the State cases they cited assertedly were based upon federal law. But as counsel acknowledged in his letter to the State judge, the Second Circuit rejected that argument upon reviewing the decisions, *see* 609 F.2d at 1054, which makes the claim of "good conscience" as unpersuasive in this context as it apparently was for Judge Lombardo. More fundamentally, however, counsel's mistake, if any, in viewing the State cases as being based upon federal law cannot itself serve as sufficient cause to excuse the procedural default. *Cf. Indiviglio v. United States,* 612 F.2d 624, 631 (2d Cir.1979): "Without some showing that counsel's mistakes were so egregious as to amount to a Sixth Amendment violation, a mere allegation of error by counsel is insufficient to establish 'cause' to excuse a procedural default" (footnote omitted).

Accordingly, the joint petition for a writ of habeas corpus must be dismissed on the ground that the federal claim has been for-

feited by a procedural default, without sufficient cause being shown to excuse it.[1]

SO ORDERED.

Dated: Brooklyn, New York
June 25, 1982

---

1. This result may focus renewed attention upon the desirability of the near absolute, explicit federal labeling requirement formulated upon the prior appeal of this case, which members of at least one panel of the Court of Appeals recently suggested may be open for reconsideration. *Daye v. Attorney General of the State of New York,* 663 F.2d 1155, 1157–58 (Newman, J.); *id.* at 1158 (Metzner, D.J., concurring).